## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

U.S. DEPARTMENT OF THE
TREASURY,

                        Plaintiff,

v.

THOMAS E. HAIDER,

                        Defendant.

                        0:15-cv-01518-DSD-HB

---

## THOMAS E. HAIDER'S MEMORANDUM OF LAW
## <u>IN SUPPORT OF HIS MOTION TO DISMISS THE COMPLAINT</u>

Jon M. Hopeman (MN Bar No. 47065)
FELHABER, LARSON, FENLON & VOGT, P.A.
220 South Sixth Street, Suite 2200
Minneapolis, MN 55402
Phone:  612-373-8540
Fax:  612-338-0535
jhopeman@felhaber.com

Ian M. Comisky (PA Bar No. 20634)
Matthew D. Lee (PA Bar No. 85914)
BLANK ROME LLP
One Logan Square, 130 North 18th Street
Philadelphia PA 19103
Phone:  (215) 569-5646
Fax:  (215) 832-5646
Comisky-im@blankrome.com
Lee-m@blankrome.com

*Attorneys for Thomas E. Haider*

May 15, 2015

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ....................................................................................1

FACTUAL BACKGROUND ......................................................................................3

      A.     Thomas E. Haider's Employment at MoneyGram ...................................3

      B.     MoneyGram's AML Program........................................................................3

      C.     The Grand Jury Investigation and MoneyGram's Deferred Prosecution Agreement4

      D.     FinCEN's Investigation of Mr. Haider ...................................................5

      E.     FinCEN's Leaks to News Media .............................................................7

      F.     FinCEN's Assessment of a Civil Money Penalty...................................9

      G.     The Justice Department's Enforcement Action ....................................10

      H.     Transfer of This Proceeding to the District of Minnesota ...................10

ARGUMENT .............................................................................................................12

I.      THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED BECAUSE THE PENALTY ASSESSED BY FINCEN MAY ONLY BE IMPOSED ON A FINANCIAL INSTITUTION, NOT AN INDIVIDUAL...................12

      A.     Legal Standards.........................................................................................12

      B.     Claim One of the Complaint Improperly Seeks to Collect a Penalty From Mr. Haider in His Individual Capacity .......................................................13

            1.     The Plain Language of Section 5318(h) Makes Clear  That Its Terms Do Not Apply to Individuals .......................................................13

            2.     Other BSA Provisions Confirm Mr. Haider's Interpretation of 31 U.S.C. § 5318(h)............................................................................15

            3.     Treasury Regulations Do Not Impose Liability on Individuals for Failing to Maintain a Comprehensive AML Program ...........................19

            4.     Recent Legislative Initiatives Further Support Mr. Haider's Interpretation of 31 U.S.C. § 5318(h)............................................................21

II.      CLAIM TWO IS INVALID BECAUSE IT FAILS TO SPECIFY WHICH PORTION OF THE CIVIL MONEY PENALTY IS ATTRIBUTABLE TO THE SAR VIOLATIONS 22

i

III.    THE COMPLAINT'S REQUEST FOR INJUNCTIVE RELIEF SHOULD BE
        DISMISSED BECAUSE IT IS TIME-BARRED.............................................................23

IV.     THE COMPLAINT SHOULD BE DISMISSED BECAUSE THE GOVERNMENT'S
        ENTIRE CASE IS PREMISED UPON GRAND JURY MATERIALS WHICH FINCEN
        IMPROPERLY ACCESSED..............................................................................................28

        A.    FinCEN Should Not Have Been Permitted to Access Materials from the Grand
              Jury Investigation of MoneyGram .......................................................................28

        B.    The Court Should Limit Additional Dissemination of the Grand Jury Materials..32

V.      THE COMPLAINT SHOULD BE DISMISSED BECAUSE THE GOVERNMENT'S
        ASSESSMENT OF A $1 MILLION CIVIL MONEY PENALTY VIOLATES MR.
        HAIDER'S DUE PROCESS RIGHTS ..............................................................................34

        A.    Mr. Haider Has Significant Property Interests at Stake ........................................36

        B.    The Standard of Review Should Be Determined in Connection  with the
              Evaluation of Mr. Haider's Due Process Rights...................................................37

        C.    The Pre-Assessment "Procedures" Employed by FinCEN Were So Deficient That
              They Created a Significant Risk of Erroneous Deprivation .................................39

              1.    FinCEN's Regulations Are Entirely Devoid of a Mechanism to Afford
                    Individuals Such As Mr. Haider Any Process Prior to Assessment .........39

              2.    The Government Refused to Disclose to Mr. Haider the Materials It
                    Obtained in Its Investigation Other Than Its *Prima Facie"* Case............42

              3.    Mr. Haider Was Denied Due Process Because FinCEN's Director, Who
                    Approved the Assessment, Was Biased Due to Her Prior Role in
                    Overseeing the MoneyGram Prosecution ..................................................47

        D.    The Government's Interest and the Burden of Additional Procedures Do Not
              Outweigh Mr. Haider's Due Process Rights.........................................................51

        E.    The Government's Disclosure of the Investigation of Mr. Haider to the Media
              Independently Violated His Due Process Rights ...................................................52

CONCLUSION...................................................................................................................53

## PRELIMINARY STATEMENT

This proceeding is the first-ever, non-consensual regulatory enforcement action brought under the Bank Secrecy Act ("BSA") against an individual for alleged anti-money laundering ("AML") compliance violations.[1]  This civil enforcement action, brought by the United States Treasury Department on behalf of the Financial Crimes Enforcement Network ("FinCEN"), arises out of Thomas E. Haider's employment as Senior Vice President and Chief Compliance Officer of MoneyGram International, Inc. ("MoneyGram"), which ended near the end of May 2008, almost seven years ago.

At all relevant times, MoneyGram was the second largest money transmitter in the world.  MoneyGram had a robust AML program, which was reviewed and approved by teams of outside consultants and experts, and the company filed thousands of Suspicious Activity Reports ("SARs") as part of its compliance regime.  Despite these efforts, and despite the fact that MoneyGram has already resolved its own AML issues through the execution of a corporate Deferred Prosecution Agreement, the government claims in this proceeding that MoneyGram's AML program was deficient and that the company failed to file a small number of SARs in 2007 and 2008 before Mr. Haider left the company.[2]

---

[1]  The Bank Secrecy Act ("BSA") is codified at 12 U.S.C. §§ 1829b, 1951-1959, and 31 U.S.C. §§ 5311-5314, 5316-5332.  Regulations implementing the BSA were recodified to appear at 31 C.F.R. Chapter X.  Treasury announced when the recodification took place that only "minor technical changes to the BSA regulations" were being made.  FinCEN, "Transfer and Reorganization of Bank Secrecy Act Regulations," 75 Fed. Reg. 65,806 (Oct. 26, 2010).  Because the events at issue occurred before the regulations were recodified and for ease of reference, prior and current C.F.R. citations are provided.

[2]  This includes several SARs addressing activity occurring outside the six-year statute of limitations and/or after Mr. Haider left MoneyGram.

The government maintains that Mr. Haider willfully (1) failed to maintain a comprehensive AML program and (2) caused these SARs not to be filed.

The government's enforcement action is, however, fatally flawed for the following reasons:

1. Title 31, United States Code, Section 5318(a) permits the imposition of a penalty for the failure to maintain a sufficient AML program only against an entity, and not an individual;

2. The Complaint's request for injunctive relief is barred by the applicable statute of limitations;

3. Title 18, United States Code, Section 3322 does not permit FinCEN to receive and then use grand jury information, including Mr. Haider's own immunized testimony, to support its Assessment; and

4. The assessment procedures utilized by FinCEN violated Mr. Haider's due process rights.

For these reasons, and as demonstrated below, the Complaint should be dismissed.

## FACTUAL BACKGROUND

### A.    Thomas E. Haider's Employment at MoneyGram

Mr. Haider is an attorney who began his employment at MoneyGram (through a predecessor company) in 1992.[3]  After Congress passed the USA PATRIOT Act in 2001, Mr. Haider was placed in charge of developing MoneyGram's BSA and AML compliance programs.  Mr. Haider was later promoted to Senior Vice President and Chief Compliance Officer, and served in that position until approximately the end of May 2008, when he left the company.  *See* Compl. ¶¶ 3, 13.

### B.    MoneyGram's AML Program

The USA PATRIOT Act resulted in the extension of certain BSA provisions to the money services business ("MSBs") industry, including the requirement of maintaining an AML program.  *See* 31 C.F.R. § 103.125 (now 31 C.F.R. § 1022.210).  The regulations adopted in 2002 (and now) were general in nature requiring an "effective anti-money laundering program," defined as "one that is reasonably designed to prevent the money services business from being used to facilitate money laundering and the financing of terrorist activities."  *Id.*  Mr. Haider assisted MoneyGram in implementing this general regulatory framework and helped develop an AML program that met all legal requirements, with the program expanding and evolving over time.  *See* Compl. ¶ 3.  MoneyGram's AML program confronted a wide range of issues including AML

---

[3]  MoneyGram is a "financial institution," a "money services business" ("MSB"), and a "money transmitter" within the meaning of the BSA and its implementing regulations. *See* 31 U.S.C. § 5312(a)(2); 31 C.F.R. § 103.11(n)(3), (uu) (now § 1010.100(t)(3),(ff)); Compl. ¶ 12.

compliance and anti-terrorist financing (which was the primary focus after the attacks of September 11, 2001), OFAC compliance, and preparing and filing Currency Transaction Reports ("CTRs") and SARs.

### C. The Grand Jury Investigation and MoneyGram's Deferred Prosecution Agreement

After Mr. Haider left his employment with MoneyGram near the end of May 2008, the United States Attorney for the Middle District of Pennsylvania commenced a federal grand jury investigation into the activities of MoneyGram with respect to its reporting of third-party consumer fraud. *See* Compl. ¶ 3. The investigation focused on third parties defrauding consumers who would be convinced to send money (using MoneyGram) to the fraudsters. *See, e.g.*, Compl. ¶¶ 30-39. As part of the investigation, several MoneyGram employees were subpoenaed to testify before the grand jury, including Mr. Haider and at least two of his subordinates.[4] (Declaration of Matthew D. Lee ¶ 9). Mr. Haider and one subordinate testified before the grand jury with some form of immunity (Lee Dec. ¶ 9), and Mr. Haider believes that the other subordinate also testified under a grant of immunity. In addition, Mr. Haider believes the documents subpoenaed were placed before the grand jury, thereby becoming grand jury information.

---

[4] As explained in greater detail below, during the investigation phase of this matter, FinCEN required that Mr. Haider and his counsel enter into two confidentiality agreements, which limited their ability to discuss documents and information provided by FinCEN. (Lee Dec. ¶ 7). FinCEN agreed to amend the agreements as of May 14, 2015 to permit discussion of certain facts related herein. (Lee Dec. ¶ 7). Any limited additional facts referred to in this memorandum with respect to the grand jury proceedings are based upon the independent knowledge of either Mr. Haider or his counsel.

The Asset Forfeiture and Money Laundering Section of the Justice Department ("AFMLS") participated in this investigation and an AFMLS attorney questioned Mr. Haider. (Lee Dec. ¶ 12).

As a result of the grand jury investigation, the United States filed an Information and Deferred Prosecution Agreement ("DPA") with respect to MoneyGram on November 9, 2012. *United States v. MoneyGram*, Cr. No. 1:12-291, Docket Entries 1 and 3 (M.D. Pa.). The Information alleged that from 2003 to 2009, MoneyGram knew that certain of its agents were involved in a scheme to defraud consumers through misrepresentations, and assisted and profited from that scheme. *United States v. MoneyGram*, Cr. No. 1:12-291, Docket Entry 1, at 1-8 (M.D. Pa.). The Information charged MoneyGram with aiding and abetting wire fraud and willfully failing to maintain a comprehensive AML program, and contained a forfeiture allegation. *Id.* at 9-13. The DPA was executed by the U.S. Attorney's Office and by AFMLS. *Id.*, Docket Entry 3, at 15.

In the DPA, MoneyGram acknowledged responsibility for the charges in the Information and agreed to be placed on probation for a period of five years. *Id.* at 2. The company also agreed to take remedial action to address the problems, to continue to enhance its anti-fraud and AML programs, and to cooperate with the Justice Department in ongoing investigations. *Id.* at 2-7. Finally, MoneyGram consented to pay $100 million to reimburse the victims of the fraud. *Id.* at 5.

### D.   FinCEN's Investigation of Mr. Haider

On October 16, 2013, Mr. Haider received a letter from FinCEN stating that it was considering assessing a civil money penalty or taking other enforcement action against

5

him, as a former officer of MoneyGram based upon possible violations of the BSA.  The

letter stated that Mr. Haider could submit any information relevant to the proposed

enforcement action to FinCEN.  (Lee Dec. at ¶ 4).

On November 15, 2013, Mr. Haider's counsel met with FinCEN officials and an

Assistant United States Attorney from the Southern District of New York.[5]  (Lee Dec. ¶

5).  At that meeting, the parties entered into a tolling agreement and discussed FinCEN's

proposed enforcement action against Mr. Haider.  (Lee Dec. ¶ 5).  FinCEN represented at

this meeting (and subsequent ones), that its investigation was based upon records

collected by the grand jury in the Middle District of Pennsylvania, which FinCEN

purportedly accessed pursuant to orders issued by the district court that oversaw the

grand jury proceedings under 18 U.S.C. § 3322(b).  (Lee Dec. ¶ 6).  Mr. Haider's counsel

has requested that FinCEN produce copies of any motions seeking and orders granting

such access.  FinCEN has agreed to provide these documents; however, they have not yet

been received.  (Lee Dec. at ¶ 8).

Although FinCEN apparently has access to all of the evidence collected by and/or

presented to the grand jury, it has shared very little with Mr. Haider.  In February and

March 2014, Mr. Haider's counsel was permitted to review approximately 500 pages of

materials which, according to FinCEN, constituted the government's *prima facie* case

against him.  Before permitting review of its *prima facie* case, FinCEN required that Mr.

---

[5]  Mr. Haider's counsel was advised that the government planned to file suit in the
Southern District of New York to enforce the Assessment in the event the matter was not
resolved by consent. (Lee Decl. ¶ 5).

Haider and his attorneys execute a rigorous confidentiality agreement.  (Lee Dec. ¶ 7).

Mr. Haider's counsel was permitted to review the *prima facie* case at FinCEN's office,

but they were not permitted to make photocopies or leave with any documents.[6]  (Lee

Dec. ¶ 7).

Mr. Haider requested that FinCEN permit his counsel to review additional

documentation but, with the limited exception noted above, the agency refused.  Pursuant

to the terms of the confidentiality agreement, if settlement negotiations terminated, Mr.

Haider and his counsel were required to place their notes and summaries with respect to

the *prima facie* case in a secure location and were forbidden to review them without the

express consent of FinCEN or a Court order.  (Lee Dec. ¶ 7).

### E.    FinCEN's Leaks to News Media

While the parties engaged in negotiations, information about the investigation was

improperly (and possibly illegally) leaked to the media.[7]  On April 17, 2014, Thomson

Reuters published an article by Brett Wolf entitled: "Exclusive: U.S. weighs $5 million

fine against exMoneyGram compliance chief."[8]   The article contained a remarkable

amount of information about FinCEN's investigation and the penalties it might seek to

impose upon Mr. Haider, including a timetable for a presentation to the agency.  The

---

[6]  FinCEN later provided a small number of additional MoneyGram emails to Mr.
Haider's counsel.  Under a second confidentiality agreement, Mr. Haider's counsel was
permitted to review these new documents in their offices without travelling to
Washington.  (Lee Dec. at ¶ 7).

[7]  Mr. Haider notes that he has been authorized to state that there is currently a Treasury
Department Office of Inspector General inquiry underway into the news media leaks.

[8]  Each of the articles and emails referenced is attached as an Exhibit to the Lee
Declaration. (Lee Dec. at ¶¶ 13-22).

article also mentioned Mr. Haider's then-employer, which previously was not aware of the existence of the investigation. As a result of the news, Mr. Haider's employer eliminated his position. (Lee Dec. ¶ 23).

On April 22, 2014, ACAMS Moneylaundering.com published an article entitled: "As FinCEN readies unprecedented fines, questions arise about its hiring authority." The article makes it clear that the reporter was intimately familiar with the evidence in FinCEN's possession. Thomson Reuters published another article by Wolf about the investigation of Mr. Haider on May 2, 2014.

On May 15, 2014, Wolf contacted Mr. Haider's counsel and advised that another article about Mr. Haider and FinCEN's investigation was forthcoming and would "quote a source with firsthand knowledge of the FinCEN case who said there is strong evidence suggesting Tom Haider played a key role in the anti-money laundering failures at MoneyGram, and that that is why the decision was made to bring action against him." The article, published the following day, was entitled "In bid to punish individual, FinCEN pursued MoneyGram business leaders, but caught compliance chief – Source." In this article, the reporter cited multiple sources, including a former FinCEN "official" who apparently left the agency and now worked in the private sector. The sources had firsthand knowledge of FinCEN's investigation and the agency's internal decision-making process. The article also noted the involvement of the U.S. Attorney's Office in Manhattan in this matter, a fact not publicly known at the time.

On September 12, 2014, Mr. Haider's counsel received another communication from Wolf, discussing the status of the negotiations and possible outcomes.  Wolf requested comment, which was declined.  Thomson Reuters thereafter published another article entitled "Developments nearing in U.S. Treasury pursuit of former MoneyGram compliance chief – source."

Thomson Reuters published another article in early October.  *See* Wolf, "Former MoneyGram compliance chief facing potential record fine regarded as anti-laundering innovator." (Oct. 6, 2014).  As with the prior articles, this article cited unnamed sources who divulged detailed facts about FinCEN's inquiry.

On December 18, 2014, just hours before this action was filed, *The Wall Street Journal*, citing "sources familiar with the matter," reported that "[a] U.S. regulator is expected to announce a fine on a former MoneyGram International Inc. chief compliance officer Thursday," noting the exact amount of the fine later assessed, demonstrating that leaks to the media came from current FinCEN employees.

As a result of these leaks, and the public disclosure of FinCEN's investigation, Mr. Haider not only lost his job, but despite considerable efforts to obtain employment, remains unemployed to this day.  (Lee Dec. ¶ 23).  Mr. Haider could not respond to the media leaks because any comments would implicate the information governed by the confidentiality agreements.

### F.     FinCEN's Assessment of a Civil Money Penalty

On December 18, 2014, FinCEN issued an Assessment of Civil Money Penalty against Mr. Haider in the amount of $1 million for alleged willful violations of the BSA

9

and its implementing regulations, just as *The Wall Street Journal* had reported it would earlier that day.  *United States Dep't of the Treasury v. Haider*, 0:15-cv-1518-DSD (D. Minn), Docket Entry 1.

### G.    The Justice Department's Enforcement Action

On the same day that the Assessment was issued, the U.S. Attorney's Office filed a 57-page complaint in the Southern District of New York seeking to (1) reduce the Assessment to a judgment in the amount of $1 million; and (2) enjoin Mr. Haider from "participating, directly or indirectly, in the conduct of the affairs of any 'financial institution'" for a term of years to be determined at trial.  Complaint ¶¶ 1-2.  The Complaint alleges that MoneyGram's AML program failed in a number of ways to comply with the regulations.  Complaint ¶ 4.  The Complaint also contains allegations about a small number of MoneyGram agents (third parties) that MoneyGram failed to report to law enforcement by way of SARs.  *Id.* ¶¶ 2, 113-126.  The Complaint alleges that Treasury issued the Assessment based on Mr. Haider's willful failure to ensure that MoneyGram: (1) implemented and maintained an effective AML program; and (2) filed timely SARs. *Id.* ¶ 64.  The Complaint does not specify what portion of the penalty is based upon the alleged failure to maintain an AML program as opposed to the alleged failure to file SARs.

### H.    Transfer of This Proceeding to the District of Minnesota

Mr. Haider believed that venue was inappropriate in the Southern District of New York.  Mr. Haider, therefore, filed a motion to transfer venue to the District of Minnesota pursuant to 28 U.S.C. § 1404(a), with a detailed description of locations of potential

10

witnesses, among other venue change requirements. *United States Dep't of the Treasury v. Haider*, 0:15-cv-1518-DSD (D. Minn), Docket Entry 7. The government did not oppose venue transfer, and the case was transferred to this Court by stipulation on March 17, 2015. *Id.* at Docket Entry 18.

Mr. Haider now seeks dismissal of the Complaint.

## ARGUMENT

I.  **THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED BECAUSE THE PENALTY ASSESSED BY FINCEN MAY ONLY BE IMPOSED ON A FINANCIAL INSTITUTION, NOT AN INDIVIDUAL**

The Complaint fails to state a claim upon which relief can be granted because, as detailed below, it is premised upon a fatally flawed Assessment.  The Assessment seeks to impose a penalty upon Mr. Haider personally for failing to maintain a comprehensive AML program, when the applicable law only permits such a penalty to be imposed upon a financial institution.[9]  Under these circumstances, this portion of the Complaint should be dismissed.

### A.    Legal Standards

The standard of review on a motion made pursuant to Fed. R. Civ. P. 12(b)(6) is whether the plaintiff pleaded sufficient facts "to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).  Determining whether a complaint crosses over the plausibility threshold is a context-specific task that "requires the reviewing court to draw on its judicial

---

[9] Mr. Haider also believes the regulations are vague and cannot form the basis for a penalty assessment, but that that issue is more properly considered at the motion for summary judgment rather than the motion to dismiss stage.

experience and common sense." *Id.* at 679.  Under this framework, dismissal is

warranted where a claim lacks a cognizable legal theory.  *Id.* at 678 ("A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged"); *accord*

*Magee v. Trustees of Hamline Univ., Minn.*, 747 F.3d 532, 535 (8th Cir. 2014).

> **B.      Claim One of the Complaint Improperly Seeks to Collect a Penalty
>           From Mr. Haider in His Individual Capacity**

In Claim One of the Complaint, the government seeks to impose liability on Mr.

Haider under 31 U.S.C. § 5318(h) for failing to maintain a comprehensive AML program

while he served as MoneyGram's Chief Compliance Officer.  In Claim Two, the

government seeks to impose liability on Mr. Haider under 31 U.S.C. § 5318(g) for failing

to file SARs.  While liability under Section 5318(g) may be imposed on both individuals

and institutions, liability under Section 5318(h) *only* applies to financial institutions.  As

a result, Claim One fails to state a claim upon which relief may be granted and must be

dismissed.

> **1.      The Plain Language of Section 5318(h) Makes Clear
>           That Its Terms Do Not Apply to Individuals**

The starting point in every case involving construction of a statute is the statutory

language itself.  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 197 (1976); *Adams v. Apfel*,

149 F.3d 844, 846 (8th Cir. 1998) (same)*.  Section 5318(h), the provision upon which

Claim One is based, provides in pertinent part as follows:

> (h) Anti-Money Laundering Programs. –

13

> (1) In general. – In order to guard against money
> laundering through financial institutions, each
> *financial institution* shall establish anti-money
> laundering programs, including, at a minimum –
>
> > (A) the development of internal policies, procedures,
> > and controls;
> >
> > (B) the designation of a compliance officer;
> >
> > (C) an ongoing employee training program; and
> >
> > (D) an independent audit function to test programs.

31 U.S.C. § 5318(h) (emphasis added).  While this is an issue of first impression before this Court, on its face, this provision applies only to "financial institutions," nowhere indicating that individual officers and employees can be held liable for an institution's failure to establish a comprehensive AML program.  In contrast, Section 5318(g) (upon which Claim Two is based), which was enacted at the same time,[10] provides in pertinent part:

> (g) Reporting of Suspicious Transactions. –
>
> > (1) In general. – The Secretary may require any financial
> > institution, and any director, officer, employee, or agent of
> > any financial institution, to report any suspicious
> > transaction relevant to a possible violation of law or
> > regulation.

31 U.S.C. § 5318(g).

The Complaint alleges that Mr. Haider was an officer of MoneyGram (Compl. ¶ 3), but he is not alleged to be a "financial institution."  It also alleges that MoneyGram was a money transmitter and a MSB (*id.* ¶ 12), with the latter being a subset of the BSA's

---

[10]  *See* Annunzio-Wylie Anti-Money Laundering Act of 1992, 102 P.L. 550, 106 Stat. 4055-4059, § 1517 (1992).

definition of financial institutions, *see* 31 U.S.C. § 5312(a)(2)(R).  The term "financial institution" is defined in 31 U.S.C. § 5312(a)(2), and includes money transmitters like MoneyGram.  The BSA separately defines the term "persons" to mean individuals and businesses.  31 U.S.C. § 5312(a)(5).  In reading these statutes together, the term "financial institution" for purposes of Section 5318(h) does not include officers or employees.

"Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Russello v. United States*, 464 U.S. 16, 23 (1983) (internal quotations omitted).  By inserting these two provisions into the BSA at the same time, Congress clearly intended to impose individual liability in subsection (g), but not in subsection (h).  Because the statute is clear on its face, no resort to legislative history is necessary.  *See Patterson v. Shumate*, 504 U.S. 753, 761 (1992).  The unambiguous text leads to only one conclusion:  Section 5318(h) does not apply to an individual such as Mr. Haider.

> **2.      Other BSA Provisions Confirm Mr. Haider's Interpretation of 31 U.S.C. § 5318(h)**

Further evidence that Section 5318(h) only applies to individuals can be found in the USA PATRIOT Act, which was the next major amendment to the BSA after the Annunzio-Wylie Act.  Section 5318 was amended by the USA PATRIOT Act, which required Treasury to promulgate regulations that "require that each financial institution designate [one] or more persons to receive information, and to monitor accounts of

individuals, entities, and organizations." *See* USA PATRIOT Act, P.L. 107-56, § 314 (2001).  There is nothing in this amendment that purports to impose penalties against compliance officers in their individual capacities or otherwise impose sanctions against them.

The USA PATRIOT Act's legislative findings also state that the purpose of the amendment was "to ensure that all appropriate elements of the financial services industry are subject to appropriate requirements to report potential money laundering transactions to proper authorities." *Id.* § 302(b)(11).  At the time that this legislation was being debated in Congress, Senator Leahy inserted language into the Congressional Record, noting that Section 5318(h) was designed to "require[] financial institutions to establish anti-money laundering programs and grant[] the Secretary of the Treasury authority to set minimum standards for such programs." 147 Cong. Rec. S10990-020.  Again, there is nothing in the USA PATRIOT Act to suggest that Congress meant to expand liability under Section 5318(h) to individuals.  To the contrary, this legislation (and its legislative history) confirms that Section 5318(h) only applies to institutions.

The Congressional rationale for the distinction between Section 5318(h) and Section 5318(g) is easy to comprehend.  The USA PATRIOT Act was promulgated after 9/11, significantly expanding the provisions of the BSA by placing substantial new requirements on financial institutions to prevent terrorist financing.[11]

---

[11]  For example, the USA PATRIOT Act requires financial institutions, upon the request of a federal banking agency to produce, within 120 hours of a request, records relating to its AML compliance or its customers; establish minimum due diligence standards for private banking accounts maintained on behalf of non-U.S. persons; and undertake

The financial institution regulatory requirements are now so extensive that one government manual, the Federal Financial Institutions Examination Council, BSA/Anti-Money Laundering Examination Manual (2014 ed.) is 324 pages, plus appendices A through T.  With the vast number of statutory and regulatory amendments since the BSA was first enacted in 1970, Congress did not intend to penalize individuals for each and every BSA violation, but rather to limit individual penalties to certain areas, such as SAR filing to prevent terrorist financing.

Sections 5318(h) and 5318(g) need not be read in isolation.  Throughout the BSA, Congress imposed obligations on individuals in a number of provisions, but not others, and filed with this memorandum is a comparison chart of these statutory differences. (Lee Dec. ¶ 10).  The chart references provisions that impose responsibilities on individual officers, which were enacted at various times during the BSA's history – further demonstrating that Congress purposefully distinguished between those provisions pursuant to which individuals could be held liable – and those that do not.  Congress began distinguishing between individual and entity liability in the BSA as early as 1982, when Section 5314 was added.  This continued with the enactment of the Comprehensive Crime Control Act of 1984, which added Section 5323; the Money Laundering Control Act of 1986, which added Section 5318(a)(4); Annunzio-Wylie in 1992, which included Sections 5318(g)(1), (2) and (3) (then codified at Sections 5314(a)(1)-(3)), as well as

---

additional due diligence with respect to certain correspondent banking accounts, as well as prohibiting correspondent accounts with shell banks.  *See* 31 U.S.C. § 5318(k)(2), § 5318(i)(3), § 5318(i)(2), & § 5318(j).

17

Section 5326(c); the Money Laundering Suppression Act of 1994, which created Sections

5324 and 5530; and finally the USA PATRIOT ACT, which enacted Section 5331.

The presumption from *Russello*, 464 U.S. at 23, that Congress acts intentionally

and purposely in the disparate inclusion or exclusion of certain language, applies

throughout the BSA. Congress plainly knew which provisions it intended to apply to

individuals and which provisions it intended to apply to institutions. In light of this

history, there is no reason to conclude that Section 5318(h) was designed to reach

individuals.

The civil penalty provision of the BSA does not support a different reading of

Section 5318(h) than that outlined above. Section 5321, the civil penalty provision of the

BSA, generally provides that individuals may be assessed civil penalties:

> A domestic financial institution or nonfinancial trade or
> business, and a partner, director, officer, or employee of a
> domestic financial institution or nonfinancial trade or
> business, willfully violating this subchapter or a regulation
> prescribed or order issued under this subchapter is liable to
> the United States Government for a civil penalty of not more
> than the greater of the amount (not to exceed $100,000)
> involved in the transaction (if any) or $25,000. For a
> violation of section 5318(a)(2) of this title or a regulation
> prescribed under section 5318(a)(2), a separate violation
> occurs for each day the violation continues and at each office,
> branch, or place of business at which a violation occurs or
> continues.

31 U.S.C. § 5321(a). However, Section 5321 is a general provision that is broadly

worded to cover any applicable BSA requirement. This section does not expand the

scope of BSA violations, or expand to whom BSA requirements apply. *Gozlon-Peretz v.*

*United States*, 498 U.S. 395, 407 (1991) ("[a] specific provision controls one of more

18

general application."); *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 698 (D.C. Cir.

2014) ("the basic principle of statutory construction [is] that a specific statute . . . controls

over a general provision . . . particularly when the two are interrelated and closely

positioned.").  Therefore, this penalty provision cannot override the specific

Congressional view that only entities can be held accountable for Section 5318(h)

violations.

### 3.  Treasury Regulations Do Not Impose Liability on Individuals for Failing to Maintain a Comprehensive AML Program

The Treasury Department has implemented a series of regulations that confirm the

above analysis.  The Title 31 penalty provision, previously at 31 C.F.R. § 103.57 and

now at Section 1010.820, sets out penalties only for violations of reporting and record

keeping requirements, structuring, failing to file foreign financial account and transaction

reports, and failing to maintain records of foreign financial accounts.  *See* 31 C.F.R. §

103.57 (now 31 C.F.R. § 1010.820).  The relevant regulation, entitled "Civil Penalty,"

states that certain penalties may be imposed against partners, directors, officers, and

employees of financial institutions for certain record keeping requirements.  31 C.F.R.

§ 103.57(a), (b), and (c) (now § 1010.820(a), (b) and (c)).  In addition, this provision

permits the Treasury Department to impose penalties against anyone for bulk cash

smuggling, Section 103.57(d) (now Section 1010.820(d)); "any person" for structuring

violations, Section 103.57(e) (now Section 1010.820(e)); financial institutions for certain

reporting requirements, Section 103.57(f) (now Section 1010.820(f)); and "any person"

for failing to report foreign bank accounts, Section 103.57(g) (now Section 1010.820(g)).

There is also a negligence penalty that may be imposed, but only against financial institutions.  31 C.F.R. § 103.57(h) (now Section 1010.820(h)).  Notably absent is any imposition of liability for failing to implement or maintain a comprehensive AML program.  *See* 31 C.F.R. § 103.57 (now Section 1010.820).

Section 103.125(a) (now Section 1022.320(a)), which established the requirement to implement an AML program with respect to MSBs, tracks Section 5318(h) and also applies only to entities, not individual officers or employees.  It states:

> Each money services business, as defined by §103.11(uu), shall develop, implement, and maintain an effective anti-money laundering program.  An effective anti-money laundering program is one that is reasonably designed to prevent the money services business from being used to facilitate money laundering and the financing of terrorist activities.

31 C.F.R. § 103.125(a) (now Section 1022.210(a)).  Because the term "money services business" is not defined to include officers and employees, *see* 31 C.F.R. § 103.11(uu) (now Section 1010.100(ff)), the requirement to maintain a comprehensive AML program rests solely with the financial institution itself, not its employees.[12]    In contrast, the SAR regulations track Section 5318(g), including the "director, officer, employee or agent" language.  31 C.F.R. § 103.20(d)-103.20(e) (now Section 1022.320(d)-1022.320(e)).

In 2002, the Treasury Department issued an interim final rule to prescribe minimum standards for the AML programs of MSBs like MoneyGram.  *See* 67 Fed. Reg.

---

[12]  Both Section 5318(h) and 31 C.F.R. § 103.125(d) (now Section 1022.210(d)) require MSBs to designate a compliance officer to assure day-to-day compliance with the established AML program.  However, this provision does not impose individual liability on the compliance officer (or anyone else).

21,114 (Apr. 29, 2002).  This interim rule requires MSBs to establish effective AML

programs, stating:

> The interim final rule requires each money services business
> to establish a program reasonably designed to prevent its use
> in money laundering or terrorist financing . . . responsibility
> for implementation of the policies, procedures, and internal
> controls rests with each money services business, and,
> particularly with respect to internal controls, a money services
> business needs to be vigilant in ensuring that such controls
> are effective in the circumstances under which it operates.

*Id.*  While this rule indicates that MSBs must designate a compliance officer, it does not

reference any specific liability that may be imposed on individuals as opposed to MSBs.

*Id.*

### 4.    Recent Legislative Initiatives Further Support Mr. Haider's Interpretation of 31 U.S.C. § 5318(h)

During the 113th Congress, legislation was proposed to remedy the lack of

individual liability for Section 5318(h) violations.  Rep. Maxine Waters, the ranking

member of the House Financial Services Committee, introduced H.R. 3317, which was

entitled the "Holding Individuals Accountable and Deterring Money Laundering Act," on

October 23, 2013.  The legislation proposed to insert several new sections into the BSA.

First, Section 101 of the bill sought to amend Section 5321(a)(1) with the following

change:

> by striking ''willfully violating'' each place such term
> appears and inserting ''willfully violating, *or willfully
> causing* any violation of,''

(emphasis added).  H.R. 3317 thus would have inserted the type of language present in

the various enforcement statutes that permit individual aiding and abetting liability.

21

Second, and more important, Section 107 of the bill contained a provision entitled "Corporate governances and the legal responsibility of officers and employees."  This section would have added a new section to the BSA, Section 5322A:

> Legal Responsibility of Certain Officers and Employees-
> With respect to any violation of this subtitle by each financial
> institution that is subject to an anti-money laundering
> program requirement under chapter X of title 31, Code of
> Federal Regulations, *any officer or other employee who was*
> *in a position that would have enabled such officer or*
> *employee to materially affect compliance with the*
> *requirements of this subtitle shall also be in violation of this*
> *subtitle, if such officer or other employee knew, or should*
> *have known, that such violation was being committed and did*
> *not take meaningful steps to stop such violation.*

H.R. 3317, 113th Cong. § 107 (2013) (emphasis added).  Under the proposed language, corporate officers could clearly be held liable for failing to implement an effective AML program.  Although failed legislation is normally not persuasive as legislative history, *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 649-50 (1990), the obvious implication from this proposed legislation is that no individual liability currently exists for violations of Section 5318(h).  Mr. Haider thus cannot be held liable under Section 5318(h) as it is currently written.

## II.   CLAIM TWO IS INVALID BECAUSE IT FAILS TO SPECIFY WHICH PORTION OF THE CIVIL MONEY PENALTY IS ATTRIBUTABLE TO THE SAR VIOLATIONS

As noted, Claim One of the Complaint seeks penalties based on Mr. Haider's alleged failure to maintain a sufficient AML program while Claim Two seeks penalties based upon Mr. Haider's alleged failure to file SARs.  As detailed in the preceding section, a portion of the Assessment is premised on an unsound legal theory, namely Mr.

22

Haider's alleged failure to establish and maintain an adequate AML program.  The

Assessment, however, does not specify the portion of the Assessment attributable to each

alleged violation.  Therefore, there is no way to differentiate between the portion of the

Assessment that may have been lawfully assessed and the part that was not.  In such

circumstances, the appropriate step is to vacate the entire Assessment.

In a similar context, when a petitioner successfully challenges an adverse agency

determination, courts remand the matter back to the agency to recompute the penalty.  *See,

e.g., Dayton Tire v. Sec'y of Labor*, 671 F.3d 1249, 1257 (D.C. Cir. 2012) (remanding to

recompute an OSHA penalty given the absence of willfulness); *Miller v. CFTC*, 197 F.3d

1227, 1236 (9th Cir. 1999) (remanding to recompute a civil monetary penalty imposed

against a futures account executive); *Yaffe Iron & Metal Co. v. United States*

*Environmental Protection Agency*, 774 F.2d 1008, 1018 (10th Cir. 1985) (remanding to

the EPA for reconsideration of a civil assessment when the ALJ made erroneous legal

assumptions).  Since there is no way to determine the amount of the improper penalty (for

the alleged AML Program deficiencies) versus the amount of the penalty relating to the

filing of SARs, this matter should be remanded to the Treasury Department for a specific

computation.

## III.   THE COMPLAINT'S REQUEST FOR INJUNCTIVE RELIEF SHOULD BE DISMISSED BECAUSE IT IS TIME-BARRED

The government seeks injunctive relief in both Claim One and Claim Two as

follows:

> By reason of the forgoing and pursuant to 31 U.S.C. § 5320,
> the Government is also entitled to an order enjoining Haider

23

> from participating, directly or indirectly, in the conduct of the
> affairs of any financial institution that is located in the United
> States or conducts business in the United States, for a term of
> years sufficient to prevent future harm to the public.

Complaint ¶¶ 135, 143.  This portion of the Complaint fails to state a claim because it was filed well after the statute of limitations expired.

"[W]hen it appears from the face of the complaint itself that the limitations period has run, a limitations defense may properly be asserted through a Rule 12(b)(6) motion to dismiss."  *Wycoff v. Menke*, 773 F.2d 983, 984-85 (8th Cir. 1985).  "[A] federal complaint does not fail to state a claim simply because it omits facts that would defeat a statute of limitations defense.  However, . . . dismissal under Rule 12(b)(6) on the basis of a limitations defense may be appropriate when the plaintiff effectively pleads herself out of court by alleging facts that are sufficient to establish the defense."  *Hollander v. Brown*, 457 F.3d 688, 691 n.1 (7th Cir. 2006).

The injunctive relief sought by the Treasury Department is time-barred.  Title 31, United States Code, Section 5320, which sets forth the Treasury Department's injunctive authority, contains no statute of limitations.[13]  In light of the absence of an express statute of limitations, Section 5320 is governed by the general five-year statute of limitations that governs all actions brought by the United States.  *See* 28 U.S.C. § 2462.  Pursuant to Section 2462, the statute of limitations expired on May 24, 2013 (five years after Mr. Haider left MoneyGram) and about five and one-half months before the parties signed

---

[13] In contrast, the civil penalty provision, Section 5321, contains a bifurcated six-year and two-year statute of limitations.

their November 15, 2013 tolling agreement.[14]  (Lee Dec. ¶ 5).  Thus, this lawsuit was

filed outside the five-year statute of limitations period and the Treasury Department's

claim for injunctive relief should be dismissed.

Section 2462 provides:

> Except as otherwise provided by Act of Congress, an action,
> suit or proceeding for the enforcement of any civil fine,
> penalty, or forfeiture, pecuniary or otherwise, shall not be
> entertained unless commenced within five years from the date
> when the claim first accrued if, within the same period, the
> offender or the property is found within the United States in
> order that proper service may be made thereon.

*Id.*

The government will contend that there is no statute of limitations for the

injunctive relief because such relief is premised on public policy concerns and is remedial

in nature.  However, if an injunction is considered penal, then the five year statute of

limitation applies.  Mr. Haider believes that this case is controlled by *Johnson v. SEC*, 87

F.3d 484 (D.C. Cir. 1996), where the District of Columbia Circuit held that an industry

bar for a specified period of time was punitive and governed by Section 2462.  *Id*. at 487-

89.  Because this proposed injunction, which is an industry bar, is plainly punitive, the

five-year statute of limitations applies.

In *Johnson*, the appellant was the branch manager of a broker-dealer, and one of

the account executives that she supervised was, unbeknownst to her, stealing client funds.

---

[14]  The Tolling Agreement did not apply to any claim that was already time-barred.  (Lee
Dec. ¶ 5).  Mr. Haider, after consultation with the government, will submit the Tolling
Agreements for this Court's review.

*Id.*  More than five years later, the SEC charged Johnson with a failure to supervise.  *Id.* at 485-86.  An Administrative Law Judge suspended her for six months, and the SEC later affirmed.  *Id.* at 486.  The *Johnson* court began by construing the term "penalty" for purposes of Section 2462 and stated that a penalty was "a form of punishment imposed by the government for unlawful or proscribed conduct, which goes beyond remedying the damage caused to the harmed parties by the defendant's actions."  *Id*.  The court noted that the sanctions imposed by the SEC resembled punishment in the "ordinary sense of the word," stating that the supervisory suspension not only would restrict Johnson's ability to earn a living, but also would become a publicly available part of her securities industry employment record.  *Id.* at 489.  Because the court found the SEC's inquiry had been retrospective, looking backward to whether the respondent had reasonably supervised the account executive rather than any risk to the public, it concluded the sanction was a punishment.  *Id.*

The court then specifically addressed the SEC's argument that Section 2462 should not apply to actions designed to protect the public.  *Id.* at 490.  The court refused to create such an exception holding that:  "[t]he …concern is not whether Congress legislated the sanction as part of a regulatory scheme to protect the public, but rather whether the sanction is itself a form of punishment of the individual for unlawful or proscribed conduct, going beyond compensation of the wronged party."  *Id.* at 491 (footnote omitted).  The court vacated the sanction.  *Id.* at 492; *see also Proffitt v. FDIC*, 200 F.3d 855, 861-62 (D.C. Cir. 2000) (applying Section 2462 in an FDIC debarment

26

proceeding); *SEC v. Bartek*, 484 F. App'x 949 (5th Cir. 2012) (holding injunctive portion of the SEC's civil enforcement action was time-barred, finding that injunctions and lifetime bar could be penal because they: (1) would have a stigmatizing effect and long-lasting repercussions; (2) would not address past harm allegedly caused by the defendants; (3) would not address the prevention of future harm "in light of the minimal likelihood of similar conduct in the future"; and (4) were sufficiently long-term to be considered punitive); *SEC v. Microtune, Inc.*, 783 F. Supp. 2d 867, 885-86 (N.D. Tex. 2011) (finding injunctive relief and officer-and-director bars sought were properly construed as penalties subject to Section 2462's statute of limitations). *Cf. SEC v. Cmlth. Chem. Secs., Inc.*, 574 F.2d 90, 99 (2d Cir. 1978) ("[A]n injunction, while not always a drastic remedy . . . , often is much more than [a] mild prophylactic . . . .").

The injunction sought here is clearly punitive such that it falls within the purview of Section 2462. The Complaint seeks to impose a penalty for a term of years "based on the evidence presented at trial." However, the facts to be adduced at trial will have no bearing on Mr. Haider's current competence and certainly no bearing on his ability to work in the future. Like in *Johnson*, FinCEN's press release announcing the Assessment and the publicly-filed court documents have made this a matter of public record, which will be available to any future employer. By focusing solely on Mr. Haider's prior conduct, the injunction does not address the prevention of future harm and does not consider "the minimal likelihood of similar conduct in the future." Most importantly, since the government is seeking a penalty lasting several years, almost eight years after

27

the conduct alleged, merely seeking an injunction is sufficiently long-term to be considered punitive as a matter of law.  Accordingly, the penalty that the Treasury Department seeks is at least in part punitive and is therefore time-barred.

**IV.    THE COMPLAINT SHOULD BE DISMISSED BECAUSE THE GOVERNMENT'S ENTIRE CASE IS PREMISED UPON GRAND JURY MATERIALS WHICH FINCEN IMPROPERLY ACCESSED**

The Complaint should also be dismissed because FinCEN's entire investigation of Mr. Haider was premised upon grand jury materials that the agency improperly obtained pursuant to 18 U.S.C. § 3322.  That statute, which authorizes disclosure of grand jury materials under certain circumstances to a "financial institution regulatory agency," does not apply here because FinCEN does not meet the statutory definition of a "financial institution regulatory agency."  As a result, FinCEN's entire case against Mr. Haider, including the Assessment, is premised upon grand jury materials that it had no legal right to review or utilize.

**A.    FinCEN Should Not Have Been Permitted to Access Materials from the Grand Jury Investigation of MoneyGram**

Individuals who are privy to grand jury information either received in the course of their duty as an attorney for the government or disclosed under Fed. R. Crim P. 6(e)(3)(A)(ii), may disclose that information to an attorney for the government for use in enforcing Section 951 of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), or in connection with a federal civil forfeiture.  18 U.S.C. § 3322(a).  In addition, the government may file a motion for a court order permitting the disclosure of grand jury information to a "Federal or State financial institution regulatory

28

agency" during an investigation of a banking law violation "for use in relation to any matter within the jurisdiction of such regulatory agency."[15]  18 U.S.C. § 3322(b)(1).  Mr. Haider believes that the disclosure here was made under Section 3322(b).  The standard for production under Section 3322 is less than otherwise required pursuant to Rule 6(e) of the Federal Rules of Criminal Procedure to access grand jury information.  The statutory test is "substantial need" under Section 3322(b)(2) rather than a "particularized need" under Rule 6(e).  18 U.S.C. § 3322(b)(2).

FinCEN should not have been permitted to access documents pursuant to Section 3322 because it is not a "Federal or State financial institution regulatory agency."  This appears to be an issue of first impression, as Section 3322 does not define the term "Federal or State financial institution regulatory agency."  Other statutory provisions, however, clearly demonstrate that FinCEN does not constitute such an agency.  The House Report, from when Section 3322 was first enacted, discusses the term "financial institution regulatory agency" in the context of a civil forfeiture under 18 U.S.C. § 981.  The House Report states that for purposes of Section 981, "financial institution regulatory agency" has the meaning contained within 12 U.S.C. § 1818(e)(7)(D).  H.R. Rep. No. 105-358, at 80, 105 Cong. 1st Session (1997).

Section 1818(e)(7)(D), in turn, defines the term "financial institution regulatory agency" to mean: (i) the appropriate Federal banking agency, in the case of an insured depository institution; (ii) the Farm Credit Administration, in the case of an institution

---

[15]  The statute defines the term "banking law violation" to include violations of the BSA. 18 U.S.C. § 3322(d)(1)(C).

chartered under the Farm Credit Act of 1971; (iii) the National Credit Union Administration Board, in the case of an insured credit union; and (iv) the Secretary of the Treasury, in the case of the Federal Housing Finance Agency ("FHFA") and any Federal home loan bank.  Conspicuously absent from this definition is FinCEN (or its predecessor, the Office of Financial Enforcement).  Although FinCEN is a bureau within the Treasury Department, the Title 12 definition reaches Treasury only in matters involving the FHFA or any Federal home loan bank, not an MSB.

Other definitional provisions confirm this conclusion.  Title 18 U.S.C. § 212, which deals with the crime of offering a loan or gratuity to a financial institutional examiner, also contains a definition of "Federal financial institution regulatory agency" that does not include FinCEN.  Section 212(c)(2) defines that term to include: (A) the Office of the Comptroller of the Currency ("OCC"); (B) the Board of Governors of the Federal Reserve System ("FRB"); (C) the Federal Deposit Insurance Corporation ("FDIC"); (D) the Federal Housing Finance Agency; (E) the Farm Credit Administration; (F) the Farm Credit System Insurance Corporation; and (G) the Small Business Administration.

A similar term, "Federal financial institutions regulatory agencies," is defined in 12 U.S.C. § 3302, in connection with the creation of the Federal Financial Institutions Examination Council ("FFIEC").  In this context, "Federal financial institutions regulatory agencies" is defined to include: the OCC, the FRB, the FDIC, the Office of Thrift Supervision ("OTS"), and the National Credit Union Administration, but again, not

30

FinCEN.  *Id.*  Given that the definitions of this term contained within the U.S. Code do not include FinCEN, Congress clearly did not intend FinCEN to be a recipient of grand jury materials pursuant to Section 3322.

Other documents, including regulatory publications and advisories, support Mr. Haider's position that FinCEN is not a "financial institution regulatory agency" within the ambit of Section 3322.  For example, the Treasury Department itself, in amending the BSA regulations with respect to SARs, has indicated that FinCEN is not a financial institution regulatory agency by referring to FinCEN separately from the federal supervisory agencies.  *See* Amendment to the BSA Regulations, 61 Fed. Reg. 4332, 4332-4333 (Feb. 5, 1996).  The FFIEC Bank Secrecy Act/Anti-Money Laundering Examination Manual (both the 2010 and 2014 editions) contains a section describing "Federal Banking Agencies" and a separate section where it describes FinCEN and differentiates it from the regulatory agencies that examine banks.  *Id.* ("FinCEN relies on the federal banking agencies to examine banks within their respective jurisdictions for compliance with the BSA.").

This legislative history and the definitional framework lead to the conclusion that Section 3322 does not apply to FinCEN.  When this legislation was passed, Congress had before it the pre-existing definitions of a financial institution regulatory agency and decided to rely on them rather create a different one for this statute.  Because FinCEN did not properly access the grand jury materials from the investigation of MoneyGram in the Middle District of Pennsylvania, the Court must dismiss this action, or conduct an inquiry

31

to determine if FinCEN had a pre-existing, independent basis to bring this action (which seems unlikely). If it did not, the Court must dismiss this action because the Complaint is based entirely upon FinCEN's improper access to grand jury information in violation of 18 U.S.C. § 3322.

### B. The Court Should Limit Additional Dissemination of the Grand Jury Materials

Section 3322(c) provides that "[a] person to whom matter has been disclosed under this section shall not use such matter other than for the purpose for which such disclosure was authorized." The Treasury Department has obtained access to Mr. Haider's grand jury testimony and, Mr. Haider believes, other grand jury information, and is using it as direct substantive evidence against him.

The government's position in this litigation must be that once information was accessed under Section 3322, the information may be publicly employed in the Assessment and the Complaint. But, there is nothing in Section 3322 that permits the public use of the information for purposes of litigation without a return to the grand jury judge and a request for an order under Rule 6(e). This procedure would have required the government to demonstrate "particularized need" rather than the less burdensome "substantial need" standard contained in § 3322.

Section 3322(b) permits the disclosure of grand jury information "for *use* in relation to any matter within the jurisdiction of [a financial institution] regulatory agency." Although the statute does not define the term "use," the legislative history of Section 3322 provides additional guidance with respect to the intended meaning of that

32

term.  The House Report commenting on Section 3322, when the bill first became law, states that before that provision was enacted, "the banking agencies have been denied [grand jury] information, which would have enabled them to respond much earlier to misconduct, to take actions to prevent an institution's failure, and to recoup funds uncovered by Federal prosecutors, to use for the benefit of the Federal deposit insurance funds or open institutions."  H.R. Rep. 101-54(I), at *474.   This focus on federal financial regulatory agencies implies that any grand jury material disclosed to such agencies (which as Mr. Haider has discussed does not include FinCEN) is not intended to be made public in a federal enforcement action without return to the grand jury.  Section 3322(b)(1) was intended to permit civil agencies to respond quickly to misconduct. There is no evidence that Section 3322(b)(1) was intended to permit the public filing of grand jury information.  There is also no evidence that Section 3322(b)(1) was intended to permit use eight years after the applicable events to respond to alleged misconduct. While it might seem sensible that "use" encompasses litigation, this is not the case. There is no indication that Congress meant to limit grand jury secrecy in this manner, and even the government has recognized the interpretative problems with the statute. [16]

---

[16]  The government has recognized that the word "use" in Section 3322 is not defined, noting that "the amendment to Section 3322 did not make clear whether the 'use' that the civil AUSA could make of the disclosed information included further disclosure to the public in the course of the litigation of a civil forfeiture case without obtaining a court order."  Department of Justice, Asset Forfeiture Policy Manual, Chapter 8, § I.A.  The Asset Forfeiture Policy Manual, although recognizing that Section 3322 could be interpreted to only permit the disclosure of grand jury materials to the public if specifically permitted by a "particularized need" Rule 6(e) Order, instead concludes, in favor of its own interests, that Section 3322 was intended to permit the public disclosure of grand jury information in publicly filed documents or at trial.  *Id.*

33

In other litigation where this issue has arisen, the government has taken the position that it alone can use the Section 3322 material.  *See In re All Assets Held at Bank Julius Baer & Company, Ltd.*, Civil Action No. 1:04-cv-00798-PLF (D.D.C.) (Dkt. No. 345 at 26-27).  The government's position in that case is that the claimants had to return to the grand jury while the government could make full use of the information prior to and during litigation.  This one-way use of information favoring the government simply cannot be the law, and Mr. Haider believes that both parties are required to return to the Middle District of Pennsylvania grand jury before grand jury information may be employed in this litigation.  Since the government did not do that here, the information was not properly employed, the Assessment was invalid and the Complaint must be dismissed.

## V.   THE COMPLAINT SHOULD BE DISMISSED BECAUSE THE GOVERNMENT'S ASSESSMENT OF A $1 MILLION CIVIL MONEY PENALTY VIOLATES MR. HAIDER'S DUE PROCESS RIGHTS

In issuing its $1 million penalty assessment against Mr. Haider and seeking injunctive relief barring Mr. Haider from the banking industry for a "term of years," FinCEN disregarded Mr. Haider's due process rights in innumerable ways.  Specifically:

1. FinCEN has *no* regulations providing *any* pre-penalty assessment mechanism to afford individuals such as Mr. Haider meaningful process and review;

2. FinCEN refused to disclose to Mr. Haider the materials it obtained during its investigation other than its so-called *prima facie* case, and required Mr. Haider and his counsel to enter into confidentiality agreements, which precluded Mr. Haider from offering any meaningful rebuttal; and

3.  The Assessment issued against Mr. Haider was
    improperly issued by FinCEN's Director, who was biased
    due to her prior role in overseeing the criminal
    investigation of MoneyGram.

Compounding the constitutional violations in this case, FinCEN improperly leaked

details of its pre-assessment investigation which, as noted, substantially harmed Mr.

Haider's reputation and resulted in the loss of his employment.

A motion to dismiss for a due process violation is treated as a motion to dismiss

for failure to state a claim upon which relief can be granted.  *See United States v. Maxi*

*Switch, Inc.*, 18 F. Supp. 2d 1040, 1041 (Ct. Int'l Trade 1998).  On a motion to dismiss, a

district court may consider "some materials that are part of the public record or do not

contradict the complaint, as well as materials that are necessarily embraced by the

pleadings."  *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 (8th Cir. 2012)

(quoting *Porous Media Corp. v. Pall Carp.,* 186 F.3d 1077, 1079 (8th Cir. 1999)).  The

Court "has complete discretion to determine whether or not to accept any material

beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion."  *Stahl*

*v. United States Dep't of Agric.*, 327 F.3d 697, 701 (8th Cir. 2003).  The Court may also

take judicial notice of the materials that Mr. Haider relies upon for his due process

arguments.  *See* Fed. R. Evid. 201(b).

Procedural due process constrains government decisions "which deprive

individuals of 'liberty' or 'property' interests within the meaning of the Due Process

Clause of the Fifth or Fourteenth Amendment."  *Kroupa v. Nielsen*, 731 F.3d 813, 818

(8th Cir. 2013) (citing *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)).  "'The

35

fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.'" *Hunter v. Underwood*, 362 F.3d 468, 478 (8th Cir. 2004) (quoting *Mathews*, 424 U.S. at 333). Courts evaluate due process challenges by applying the standard set out by the Supreme Court in *Mathews*. This test requires courts to balance: (1) the private interest at stake; (2) the risk of an erroneous deprivation of that interest through the procedures used and the probable value of alternative procedures; and (3) the government's interest, including the function involved and the burdens of additional procedures. *Mathews*, 424 U.S. at 335. Under this standard, Mr. Haider's due process rights were unquestionably violated.

### A.    Mr. Haider Has Significant Property Interests at Stake

As a preliminary matter, there can be little doubt that FinCEN's Assessment implicates Mr. Haider's property rights. *See, e.g.*, *Business Communications, Inc. v. U.S. Dep't of Education,* 739 F.3d 374, 379 (8th Cir. 2013) (back pay award is property interest subject to due process requirements). It is also well established that an injunction or debarment order preventing an individual from holding specific employment implicates a property interest for due process purposes. The Supreme Court addressed this very issue in *FDIC v. Mallen*, 486 U.S. 230 (1988), where the FDIC acted under its statutory authority to prohibit a bank president under indictment from participating in the affairs of his employer, a federally-insured bank. The Court noted that the FDIC's order of suspension effected a deprivation of a property interest, and that the bank official was therefore entitled to due process protections. *Id.* at 240. Similarly, in *Greene v. McElroy*, 360 U.S. 474 (1959), the Supreme Court stated that "the right to hold specific private

36

employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment . . . ." *Id.* at 492; *see also Chernin v. Lyng*, 874 F.2d 501, 505 (8th Cir. 1989) (employees have "a right enforceable in law against third parties who unlawfully interfere with the[ir] employment relation[s]").

**B.    The Standard of Review Should Be Determined in Connection with the Evaluation of Mr. Haider's Due Process Rights**

Mr. Haider next discusses the standard of review because it is important in connection with the due process issues raised in this motion.  Mr. Haider expects that the government will contend that the appropriate standard of review in this proceeding is "abuse of discretion."  In recent cases addressing the assessment of a penalty under the BSA for failure to disclose foreign bank accounts pursuant to the same statute the government will contend applies here, 31 U.S.C. § 5321, the government argued that the district court should review the amount of the penalty under an abuse of discretion standard applicable to administrative agency review.  *See United States v. Williams,* 114 AFTR2d 2014-5036, 2014 WL 3746497, at *2 (E.D. Va. June 26, 2014) ("Because review of the penalty *amount* is the only remaining issue in this case, the appropriate standard of review is abuse of discretion"), *on remand from* 489 F. App'x 655, 658 (4th Cir. 2012); *Moore v. United States*, 115 AFTR2d 2015-1375, 2015 WL 1510007, at *4 (W.D. Wash. Apr. 1, 2015) (government proposed that the court determine *de novo* whether Mr. Moore was subject to an FBAR penalty; court reviewed the determination of the amount of the penalty under an abuse of discretion standard).

37

In the most recent case, *Moore*, the district court applied a *de novo* standard to the imposition of the penalty only because that standard was proposed by the government. The district court noted that because the BSA requires that the penalty first be assessed, and then the government may commence a civil penalty action to recover the penalty, *id.* at 8, agencies assessing penalties under the BSA have "considerable latitude to fashioning procedures, subject only to the constitutional limits of due process," *id.* The court suggested the government's concession as to the standard of review for the imposition of the penalty was unnecessary and that an abuse of discretion standard could be applied both to the decision to impose the penalty and with respect to the penalty amount. *Id.* at 4 n.3. The court then ruled in favor of the agency, emphasizing that even though Moore was not provided with pre-deprivation review, he was provided with an administrative appeal (Mr. Haider received no such appeal, as is discussed herein) and could later obtain judicial review to address any process deficiencies. *Id.* at 11.

Mr. Haider anticipates that the government will make similar arguments in this case – that Mr. Haider's liability and/or the amount of the civil money penalty assessment ($1 million) may only be reviewed for an abuse of discretion. If abuse of discretion is the standard of review to be applied here either in whole or in part, Mr. Haider's due process rights were violated because of the lack of pre-assessment process.

Mr. Haider believes that even with *de novo* review, the procedures afforded by FinCEN were so lacking that due process was violated. The *Williams* court noted that the agency must engage in reasoned decision-making and that there must be a "rational

connection between the facts found and the choice made." *Williams*, 2014 WL 3746497,

at *2; *see also Rochling v. Dep't of Veterans Affairs*, 725 F.3d 927, 933 (8th Cir. 2013) (a

district court has the authority in actions governed by the Administrative Procedures Act

to engage in *de novo* review "when the action is adjudicatory in nature and the agency

fact-finding procedures are inadequate."). Here, no such rational determination was

made. The assessment issued by FinCEN does not differentiate between the penalties

associated with Mr. Haider's alleged failure to file SARs and his alleged failure to

implement an effective AML policy, preventing any determination of the connection

between the facts and the choice made. In any event, it is the lack of process provided to

which Mr. Haider now turns.

### C.   The Pre-Assessment "Procedures" Employed by FinCEN Were So Deficient That They Created a Significant Risk of Erroneous Deprivation

#### 1.   FinCEN's Regulations Are Entirely Devoid of a Mechanism to Afford Individuals Such As Mr. Haider Any Process Prior to Assessment

Mr. Haider's due process rights were violated because FinCEN has *no* regulations

governing procedures to be followed by the agency prior to the assessment of a civil

money penalty. As a result, FinCEN may – as it did in this case – summarily assess a

civil money penalty without providing the affected individual or entity any significant

measure of process or a meaningful opportunity to contest the proposed action.

FinCEN has set out absolutely no rules pertaining to its pre-assessment

procedures. 31 Part 1010, Subpart H, entitled "Enforcement; Penalties, and Forfeiture"

contains no rules about the agency's internal procedures. Section 1010.820 simply lists

an assortment of potential civil penalties, and Section 1010.810 delegates FinCEN's

enforcement responsibilities to examine financial institutions to an amalgam of agencies.

By contrast, the agencies subject to this delegation authority have promulgated

regulations that afford meaningful due process as follows:

| Agency | Applicable Regulations |
| --- | --- |
| Comptroller of the Currency | 12 CFR Chapter I, Part 109, Subpart A |
| U.S. Commodity Futures Trading Commission | 17 CFR, Chapter I, Part 10 |
| FDIC | 12 CFR, Chapter III, Part 308, Subchapter A |
| Federal Home Loan Bank Boards | 12 CFR, Chapter XII, Subchapter A, Part 1209, Subpart C |
| Federal Reserve Board | 12 CFR, Chapter II, Part 263, Subpart A |
| National Credit Union Administration | 12 CFR, Chapter VII, Part 747, Subchapter A |
| U.S. Securities and Exchange Commission | 17 CFR, Chapter II,  Part 201, Subpart D |

Every one of these agencies provides for a hearing before a neutral hearing officer.

The above procedures provide for document discovery and the opportunity to cross

examine witnesses.  There are no such requirements with respect to penalties assessed by

FinCEN itself.

An instructive analogy is provided by Treasury regulations that provide a clear and

concise framework to be followed by the IRS before it may assess taxes, interest, and/or

penalty amounts against a taxpayer.[17]  At the conclusion of any taxpayer examination, the

---

[17] Section 1010.810 also delegates some penalty enforcement responsibility to the IRS. The IRS provides meaningful due process.  The Service has prepared a list of information that is to be collected during an examination. Internal Revenue Manual ("IRM") § 4.26.6 (AML penalties) and § 4.26.17 (foreign bank accounts).  The IRS permits an appeal of any BSA penalty to the IRS Appeals Division as is discussed further herein.

IRS revenue agent is required to prepare a "Revenue Agent Report" which summarizes the agent's findings, conclusions, and proposed adjustments. IRM § 4.10.8.12.4.[18] The taxpayer is then provided with the information, including the facts upon which the IRS has relied in proposing an adjustment to the taxpayer's return or returns, and if the case is "unagreed," meaning that the IRS and the taxpayer do not agree upon the audit findings/adjustments, the IRS issues what is known as a "30-day letter" to allow the taxpayer 30 days to seek review by the IRS Appeals Division. IRM § 4.10.8.12.1.

The IRS Appeals Division, which is a separate operating division within the IRS, *id*. § 8.1.1.1, considers protested cases, holds conferences, and negotiates settlements, *id*. § 8.1.1.1.[19] Of critical importance, IRS Appeals is an independent organization within the agency. *See* Appeals – An Independent Organization (available at http://www.irs.gov/Individuals/Appeals-An-Independent-Organization).[20]

If a taxpayer is unable to reach a resolution with IRS Appeals, the agency issues a "Statutory Notice of Deficiency," which is a formal document setting forth the audit adjustments and providing the taxpayer with notice that the IRS has determined that there is a deficiency in taxes, interest, and/or penalties. *See* 26 U.S.C. § 6212(a). Upon receipt

---

[18] The IRM was updated in minor fashion in 2014; substantially identical provisions existed at the time of the FinCEN notice under I.R.M. § 4.10.8.11.2.

[19] These IRM provisions were updated in 2014; the Manual Transmittal notes that only minor changes were being made.

[20] One way in which the independence and neutrality of Appeals is maintained is through the use of rules prohibiting *ex parte* communications between Appeals officers and other IRS employees that may appear to compromise the independence of Appeals officers. *Id*.

of the "Statutory Notice of Deficiency," the taxpayer has the right to seek pre-payment judicial review in the U.S. Tax Court by filing a petition within 90 days.  26 U.S.C. § 6213(a).  Only if the taxpayer fails to seek judicial review on a timely basis does the assessment become final and thereafter subject to enforcement and collection.  26 U.S.C. § 6213(c).

These procedures stand in stark contrast to the FinCEN regulatory regime. FinCEN has *no* regulations or procedures to discover and contest the factual and legal bases for the agency's proposed penalty, to offer rebuttal evidence and/or argument, to challenge the proposed action before a neutral arbiter, or to obtain a full delineation of the basis for the penalty.  There is no procedure like the IRS Appeals function, which was relied upon in *Moore* in rejecting a due process challenge.  *Moore*, 2015 WL 1510007 at *11-12.  FinCEN's failure to afford a meaningful opportunity to challenge a proposed civil money penalty assessment violates due process.

> **2.     The Government Refused to Disclose to Mr. Haider the Materials It Obtained in Its Investigation Other Than Its "*Prima Facie*" Case**

Mr. Haider submits that the *ad hoc* procedures (or lack thereof) followed by FinCEN in issuing the Assessment involved a significant risk of erroneous deprivation.  It is well established that the right to know the factual basis for a government action and the opportunity to rebut the evidence supporting that action are essential components of due process.  *Matthews,* 424 U.S. at 345-46 (noting that disability recipients were permitted full access to all information relied upon by the agency); *Nevels v. Hanlon*, 656 F.2d 372, 376 (8th Cir. 1981) ("It is fundamental to a full and fair review required by the due

process clause that a litigant have an opportunity to be confronted with all adverse

evidence and to have the right to cross-examine available witnesses."); *Business*

*Communications Inc.,* 739 F.3d at 381-82 (holding that pre-deprivation procedures

violated due process). As the Supreme Court long-ago recognized in *Greene v. McElroy*,

360 U.S. 474 (1959):

> Certain principles have remained relatively immutable in our
> jurisprudence. One of these is that where governmental
> action seriously injures an individual, and the reasonableness
> of the action depends on fact findings, the evidence used to
> prove the Government's case *must be disclosed* to the
> individual so that he has an opportunity to show that it is
> untrue.

*Id.* at 496 (emphasis added). This is true with respect to both documentary and

testamentary evidence. *Id.*; *see also Hull v. Dep't of the Air Force*, 374 F. App'x 981,

983 (Fed. Cir. 2010) (*ex parte* presentation of new information denies due process);

*American-Arab Anti-Discrimination Comm. v. Reno*, 70 F.3d 1045, 1069-70 (9th Cir.

1995) ("[T]he very foundation of the adversary process assumes that use of undisclosed

information will violate due process because of the risk of error."; "Only the most

extraordinary circumstances could support one-sided process."); *Swank v. Smart*, 898

F.2d 1247, 1253 (7th Cir. 1990) ("Ex parte presentation of evidence denies due process";

further holding that failure to provide witness statement violated due process).

FinCEN's procedure in assessing a civil money penalty against Mr. Haider

violated due process. Although Mr. Haider was notified by letter that FinCEN was

considering assessing a penalty and/or taking other enforcement action against him and

that he was permitted to submit to FinCEN "any information relevant to [FinCEN's]

43

evaluation," Mr. Haider was severely limited in responding because FinCEN provided

Mr. Haider with only its *prima facie* case, forcing Mr. Haider to guess with respect to

what he should try to refute.[21]  This procedure contravened any basic definition of

fairness or due process.  *See Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S.

123, 167, 170 (1951) (Frankfurter, J., concurring) ("[s]ummary administrative procedure

may be sanctioned by history or obvious necessity.  But these are so rare as to be isolated

instances . . . democracy implies respect for the elementary rights of men, however

suspect or unworthy; a democratic government must therefore practice fairness; and

fairness can rarely be obtained by secret, one-sided determination of facts decisive of

rights.").

FinCEN's decision to disclose only its *prima facie* case to Mr. Haider is contrary

to *Brady v. Maryland*, 373 U.S. 83 (1963), where the Supreme Court ruled that, in

criminal cases, the prosecution must turn over exculpatory evidence and evidence that is

material to the guilt, innocence, or punishment of the defendant.  A number of prominent

federal regulators have adopted this *Brady* rule: the Commodity Futures Trading

Commission (*In re First Guaranty Metals Co.*, 1980 CFTC LEXIS 141, at *28-29 (Nov.

13, 1981)); the FDIC (*First Guar. Bank*, No. FDIC-95-65e, 1997 WL 33774615, at *2

(F.D.I.C., Apr. 7, 1997)); the Federal Energy Regulatory Commission (Policy Statement

on Disclosure of Exculpatory Materials, 129 FERC ¶ 61,248 (Dec. 17, 2009)); and the

---

[21]  Indeed, unlike the IRS, which conducts a sizable number of BSA audits and provides a detailed handbook explaining when it will exercise its enforcement authority, and what factors will be considered, *see* IRM §§ 4.26.6 & 4.26.9*,* FinCEN provides absolutely no formal guidance as to when it will engage in enforcement action.

Securities and Exchange Commission (17 C.F.R. § 201.230(b)(2) (2009)).  FinCEN should be held to the same standard.

The due process violation extends not only to any documents obtained from third parties such as MoneyGram,[22] but also to evidence obtained from the grand jury investigation of MoneyGram, which the Treasury has acknowledged was obtained pursuant to 18 U.S.C. § 3322.  FinCEN permitted counsel to review only certain very limited information from the grand jury proceedings investigating MoneyGram, including certain testimony, and solely for purposes of engaging in settlement discussions pursuant to stringent confidentiality agreements.  FinCEN refused to permit the undersigned to review any documentation from its investigation beyond FinCEN's *prima facie* case, or even to make copies of the transcripts provided.

Mr. Haider believes that he had a right to access the grand jury transcripts provided and *all other* grand jury information upon which the Assessment and this Complaint were based, all *Brady* information, and all information in FinCEN's possession relating to MoneyGram.  This is particularly true given that any grand jury secrecy interest has already been lessened by the disclosure of testimony to FinCEN, and FinCEN's use of grand jury information in these proceedings.  Mr. Haider's due process

---

[22]  MoneyGram has adopted a posture of "neutrality" in this proceeding and limited Mr. Haider's access to documents and information.  *See* Declaration of Matthew D. Lee (ECF #9).

rights warranted disclosure of all of the grand jury materials and other materials obtained by FinCEN.[23]

In this regard, *Al Haramain Islamic Found., Inc. v. United States Dep't of the Treasury*, 686 F.3d 965 (9th Cir. 2012), is instructive. There, the Ninth Circuit addressed a situation in which the government withheld classified information it relied upon in designating an entity as a terrorist organization, and determined that the government could reasonably undertake additional measures to mitigate the unfairness of that procedure. 686 F.3d at 980-81. The Court noted the problems with the government's one-sided procedure even in the context of a case involving national security concerns:

> Without disclosure of classified information, the designated entity cannot possibly know how to respond to OFAC's concerns. Without knowledge of a charge, even simple factual errors may go uncorrected despite potentially easy, ready, and persuasive explanations.

*Id.* at 982. Based upon these problems, the Ninth Circuit held that the government could, with relatively minimal effort, provide an unclassified summary of its classified evidence, or permit the entity's counsel to review the classified information after obtaining the proper security clearance and pursuant to a protective order without implicating national security. *Id.* at 983. The Court further held that the entity's due process rights were violated, stating that "the opportunity to guess the factual and legal basis for a government action does not substitute for actual notice. . . ." *Id.* at 986-87. The same

---

[23]  Mr. Haider contends that FinCEN had no right to access grand jury materials pursuant to 18 U.S.C. § 3322(b). *See supra* Section IV, A. Of course, if FinCEN had no right to such materials, its investigation and Assessment are fatally flawed.

result should apply here.  Mr. Haider should not have been required to "guess" at

FinCEN's evidence, and he should have been permitted to examine the documents and

testimony in FinCEN's possession.

>    **3.**    **Mr. Haider Was Denied Due Process Because FinCEN's**
>             **Director, Who Approved the Assessment, Was Biased Due to**
>             **Her Prior Role in Overseeing the MoneyGram Prosecution**

FinCEN's decision to issue a civil monetary penalty against Mr. Haider was

irreparably flawed because the penalty was imposed by Jennifer Shasky Calvery, the

Director of FinCEN.  Ms. Shasky Calvary signed the Assessment at issue here.  *See*

Assessment at 50 (December 18, 2014).  In a previous position, Ms. Shasky Calvery was

the head of AFMLS, and was heavily involved in and supervised the prosecution of

MoneyGram, which was based upon the same facts at issue here.

Under the due process clause, parties and the public are entitled to tribunals free of

bias.  *In re Murchison*, 349 U.S. 133, 136 (1955); *see also Schweiker v. McClure*, 456

U.S. 188, 195 (1982) ("[D]ue process demands impartiality on the part of those who

function in judicial or quasi-judicial capacities.") (citing *Marshall v. Jerrico, Inc.*, 446

U.S. 238, 242-43, & n. 2 (1980)). This requirement is applicable not only to the courts,

but also to administrative agencies.  *Jerrico, Inc.*, 446 U.S. at 242; *Withrow v. Larkin*,

421 U.S. 35, 46 (1975); *Gibson v. Berryhill*, 411 U.S. 564, 579 (1973).

In determining whether a litigant's due process rights have been violated, courts

begin with the presumption that administrative officers making adjudicative decisions are

unbiased.  *Schweiker*, 456 U.S. at 195; *Richmond v. Fowlkes*, 228 F.3d 854, 858 (8th Cir.

2000).  A litigant may overcome this presumption by demonstrating a conflict of interest,

bias, prejudgment, or "some other specific reason for disqualification." *Schweiker*, 456

U.S. at 195; *Withrow*, 421 U.S. at 47; *Gibson*, 411 U.S. at 578; *Richmond*, 228 F.3d at

858; *Yamaha Motor Corp., U.S.A. v. Riney*, 21 F.3d 793, 798 (8th Cir. 1994).

Actual bias is not required for a due process violation. *Caperton v. A.T. Massey*

*Coal Co., Inc.*, 556 U.S 868, 883 (2009); *Prewitt v. Reiser*, Civil No. 13–2866 (JRT/LIB),

2014 WL 5325356, at *19 (D. Minn. Feb. 19, 2014). The inquiry is objective, and the

litigant claiming a due process violation need only show that there is an unconstitutional

potential for bias or prejudgment. *Morgan v. Goldman (In re Morgan)*, 573 F.3d 615,

624 (8th Cir. 2009) (citing *Caperton*, 556 U.S. at 881); *Prewitt*, 2014 WL 5325356, at

*19. In other words, "the test is whether the adjudicator's situation is one 'which might

lead [her] not to hold the balance [between the parties] nice, clear and true.'" *Yamaha*

*Motor Corp.*, 21 F.3d at 798 (quoting *Tumey v. Ohio*, 273 U.S. 510, 532 (1927)).

Although the combination of investigative and adjudicative agency functions does

not itself constitute a due process violation, *Fowlkes*, 228 F.3d at 858 (citing *Withrow*,

421 U.S. at 58), courts have found that participation in prosecutorial (as opposed to

investigative) functions prior to engaging in adjudicative functions in the same case can

violate the due process clause. *See William Jefferson & Co. v. Bd. of Assessment &*

*Appeals No. 3 for Orange County*, 695 F.3d 960, 965 (9th Cir. 2012); *Walker v. Berkeley*,

951 F.2d 182, 184-85 (9th Cir. 1991); *American General Insurance Co. v. Federal Trade*

*Commission*, 589 F.2d 462, 464-65 (9th Cir. 1979). Other circuit courts have come to

similar conclusions. *See Utica Packing Co. v. Block*, 781 F.2d 71, 77-78 (6th Cir. 1986)

(finding a violation of due process when agency officials involved in a prosecution who were displeased with a decision of an administrative law judge removed that judge from office and replaced him with an individual previously supervised by those involved in the prosecution); *Amos Treat & Co. v. SEC*, 306 F.2d 260, 267 (D.C. Cir. 1962) (finding a due process violation when a former division director of the SEC participated, after his appointment as a Commissioner, in a case in which he had prior involvement).

One case in particular is instructive. In *American Cyanimid Co. v. FTC*, 363 F. 2d 757, 763-67 (6th Cir. 1966), an antibiotic patent was at issue. After a hearing examiner issued a ruling in favor of the drug companies, the FTC reversed. A motion had been made to disqualify an FTC Commissioner because the Commissioner had previously been the Staff Director of the Subcommittee on Antitrust and Monopoly of the Senate Judiciary Committee. The Sixth Circuit held that the Commissioner should have recused himself, noting: "As Chairman, Mr. Dixon sat with the other members as triers of the facts and joined in making the factual determination upon which the order of the Commission is based. As counsel for the Senate Subcommittee, he had investigated and developed many of the same facts." *Id.* at 767. If one substitutes AFMLS and FinCEN for the Senate Committee and FinCEN, the facts are the same here. *See also MFS Sec. Corp. v. SEC*, 380 F.3d 611, 613, 616 (2d Cir. 2004) (defendants attempted to appeal a disciplinary penalty from the New York Stock Exchange, challenging the SEC's decision to dismiss its application for review of the penalty, claiming that the agency was biased

by two chairmen who worked on the matter before it went before the agency; holding that

no due process violation occurred where the two chairmen at issue had been recused).

Ms. Shasky Calvery served as the Director of AFMLS, the office that *supervised*

the grand jury investigation of MoneyGram, from 2010 until 2012, leaving AFMLS just

before MoneyGram's deferred prosecution agreement was finalized. (Lee Dec. at ¶ 11).

During Ms. Shasky Calvery's tenure at AFMLS, Mr. Haider testified before the grand

jury under a grant of statutory immunity.  Ms. Shasky Calvery would have been involved

in the decision to grant Mr. Haider immunity, as the decision to recommend immunity

would have been made by the DOJ Trial Attorney in her office and the decision to

approve the immunity would have been made by her immediate supervisor, the Deputy

Assistant Attorney General.  U.S. Attorney's Manual § 9-23.130.  Ms. Shasky Calvery

also would have approved immunity orders for everyone else appearing before the grand

jury. *See id*.  In addition, Ms. Shasky Calvery's direct report (Craig Timm) questioned

Mr. Haider before the grand jury.  And, Mr. Timm, as noted, executed the DPA on behalf

of the Justice Department.  (*See* Lee Dec. at ¶ 12 (noting Mr. Timm's involvement in the

grand jury investigation)).  The DPA was entered into just weeks after Ms. Shasky

Calvery left AFMLS.  Ms. Shasky Calvery was thus inextricably involved in this

prosecution.

If all of this was not enough, it has been clear throughout FinCEN's investigation

that it intended to assess a penalty regardless of any pre-assessment presentation made by

Mr. Haider.  Specifically, an Assistant United States Attorney from the Southern District

of New York participated in the very first meeting between FinCEN and Mr. Haider's counsel, long before a complaint was ever filed, and participated in all substantive meetings and calls. This clearly establishes that FinCEN believed from the inception that the matter was headed to litigation. This prophesy turned out to be correct.

It thus seems clear that Ms. Shasky Calvery received information and made judgments about the facts in her prosecutorial role and carried this information to FinCEN where she acted in an adjudicatory role. As a result, it was entirely inappropriate for her to have served as the decision-maker who approved the Assessment against Mr. Haider. If nothing else, this has the appearance of impropriety. As the SEC chairmen did in *MFS Sec. Corp.*, the proper course was for Ms. Shasky Calvery to recuse herself from any decision-making with respect to Mr. Haider. Because this was not done, a due process violation occurred.

### D.    The Government's Interest and the Burden of Additional Procedures Do Not Outweigh Mr. Haider's Due Process Rights

The government's interest appears to be in taking enforcement actions against those believed to violate the BSA in order to protect the national financial system. But such an interest cannot outweigh Mr. Haider's interest in fair procedures.

The Supreme Court long ago recognized that "[t]he fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution." *INS v. Chadha*, 462 U.S. 919, 944 (1983). Thus, any interest in speed and efficiency cannot overcome Mr. Haider's interests. Indeed, given that Mr. Haider has not worked at a financial institution

51

since 2008 and thus presented no threat to the financial system, FinCEN had no real interest in speed or efficiency.

Courts have found much more significant government interests outweighed by an individual's right to access the evidence against him.  *See Ralls Corp. v. Committee on Foreign Inv. In U.S.,* 758 F.3d 296, 318 (D.C. Cir. 2014) (a substantial interest in national security supports withholding classified information, but does not excuse the failure to provide notice of, and access to, the unclassified information used to prohibit the transaction); *Al Haramain Islamic Found., Inc.*, 686 F.3d at 983 (finding that OFAC's concerns that providing an entity to be designated a foreign terrorist organization with an unclassified summary of classified information or providing other additional process would overwhelm the agency had "little practical reality" because a summary would require a small expenditure of time and resources that "would not outweigh the entity's interest in knowing the charges and evidence against it.").  Permitting Mr. Haider to access FinCEN's evidence against him would not detract from any interest that the agency had in investigating this matter.

### E.     The Government's Disclosure of the Investigation of Mr. Haider to the Media Independently Violated His Due Process Rights

FinCEN began leaking information to the media months before it issued the Assessment and filed this action, long before its investigation of Mr. Haider was completed.  It is absolutely incontrovertible that such information leaks, impugning Mr. Haider's character in the eyes of the public (and more importantly, his then-employer)

prior to the completion of a proper investigation, involved a significant risk of erroneous deprivation.  (*See* Lee Dec. at ¶¶ 13-23).

Before an investigation is complete, it simply cannot be said whether suspicions are supported by evidence.  Yet, FinCEN again and again permitted information about its investigation to be leaked to the media before any final conclusions had been reached. These actions not only risked the erroneous deprivation of Mr. Haider's rights, but actually caused such deprivation.  Mr. Haider's loss of employment was easily avoidable had FinCEN simply kept its investigation confidential, as is the normal course.  Such "additional procedures," if keeping silent can even be called that, would have involved no burden whatsoever upon the government, tipping the *Mathews* balance firmly in favor of Mr. Haider.[24]

## CONCLUSION

For the foregoing reasons, defendant Thomas E. Haider's Motion to Dismiss the Complaint should be granted.

---

[24] FinCEN's leak of its investigation to the media is a clear violation of his due process rights under the stigma-plus doctrine.  *See Gunderson v. Hvass*, 339 F.3d 639, 644 (8th Cir. 2003); *Shands v. City of Kennett*, 993 F.2d 1337, 1346-47 (8th Cir. 1993).

Dated:  May 15, 2015                  FELHABER, LARSON, FENLON & VOGT, P.A.

                                      By:  __/s/ Jon M. Hopeman_____
                                            Jon M. Hopeman (MN Bar No. 40765)
                                      220 South Sixth Street, Suite 2200
                                      Minneapolis, MN 55402
                                      Phone:  612-373-8540
                                      Fax:  612-338-0535
                                      jhopeman@felhaber.com

                                      BLANK ROME LLP

                                      By:  ___/s/ Ian M. Comisky_____
                                            Ian M. Comisky (PA Bar No. 20634)
                                            Matthew D. Lee (PA Bar No. 85914)
                                      One Logan Square, 130 N. 18th Street
                                      Philadelphia PA 19103
                                      Phone:  (215) 569-5646
                                      Fax:  (215) 832-5646
                                      Comisky-im@blankrome.com
                                      Lee-m@blankrome.com

                                      *Attorneys for Thomas E. Haider*

54

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

U.S. DEPARTMENT OF THE
TREASURY,

                              Plaintiff,

v.

THOMAS E. HAIDER,

                             Defendant.

Court File No.
0:15-cv-01518-DSD-HB

**CERTIFICATE OF SERVICE**

---

     I hereby certify that on May 15, 2015, I caused: Defendant Thomas E. Haider's Memorandum of Law in Support of His Motion to Dismiss the Complaint to be electronically filed and served on all counsel of record through the Court's Electronic Filing System.


                          By:   /s/ Matthew D. Lee
                                   Matthew D. Lee