**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| U.S. DEPARTMENT OF THE TREASURY, | |
| Plaintiff, | 0:15-cv-01518-DSD |
| v. | |
| THOMAS E. HAIDER, | |
| Defendant. | |

## MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANT'S
## MOTION TO DISMISS THE COMPLAINT

Andrew M. Luger
United States Attorney for the
District of Minnesota
Attorney for Plaintiff
600 U.S. Courthouse
300 South 4th Street
Minneapolis, MN 55415

CHRISTOPHER B. HARWOOD
   JESSICA JEAN HU
Special Assistant United States Attorneys
      - Of Counsel -
Telephone:  (212) 637-2728/2726
Facsimile:  (212) 637-2717

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

BACKGROUND .......................................................................................................... 3

A. MoneyGram's Money Transfer Business ............................................................. 3

B. Haider Failed to Ensure that MoneyGram Implemented And Maintained an
   Effective AML Program or Fulfilled Its Obligation to File Timely SARs .................... 4

C. Haider's Compliance Failures Resulted in Substantial Losses to Victim
   Consumers ........................................................................................................ 7

D. MoneyGram Has Already Admitted that, Under Haider, It Lacked an
   Effective AML Program ...................................................................................... 7

E. FinCEN's Assessment Against Haider ................................................................. 8

STANDARD OF REVIEW ............................................................................................ 9

ARGUMENT .............................................................................................................. 9

I.  The Complaint Adequately Pleads a Claim Against Haider Under 31 U.S.C.
    § 5321(a)(1) for Violations of 31 U.S.C. § 5318(h) ............................................ 9

A. The Plain Language of Section 5321(a)(1) Makes Clear That Individuals
   Are Subject to Civil Penalties for Violations of Section 5318(h) .......................... 10

B. Congress Has Made Clear Its Intent that Individuals Are Properly Subject
   to Liability Under Section 5321(a)(1) for Violations of Section 5318(h) ................ 15

   1.  As Originally Enacted, Section 5321(a)(1) Explicitly Provided For
       Individual Liability ..................................................................................... 15

   2.  In Recodifying Section 5321(a)(1), Congress Made Clear that It Did Not
       Intend to Make Any Substantive Changes to the Statute .............................. 15

C. Haider's Remaining Arguments for Why Section 5321(a)(1) Should Not Be
   Read as Imposing Liability on Individuals for Violations of Section 5318(h)
   Are Unavailing ................................................................................................ 19

   1.  Subsequent Amendments to Other Provisions of the BSA Did Not Alter
       the Scope of Section 5321(a)(1) ................................................................... 19

2. 31 C.F.R. § 1010.820 Does Not Undermine the Conclusion that Individuals Are Properly Subject to Liability Under Section 5321(a)(1) for Violations of Section 5318(h).................................................. 20

3. The Un-Enacted Legislation Haider Cites Is Immaterial ..................................... 22

II. The Assessment Supports the Imposition of a Civil Money Penalty of $1 Million as to both the AML and SAR-filing claims ..................................... 24

III. The Complaint's Claim for Injunctive Relief Is Timely................................ 26

A. The Complaint's Claim for Injunctive Relief Is Not Subject to Any Statute of Limitations.................................................................................. 27

B. Under the Concurrent Remedy Doctrine, the Same Statute of Limitations that Applies to the Government's Civil Money Penalty Claim Should Also Apply to Its Claim for Injunctive Relief ..................................... 28

C. Section 2462's Limitations Period Does Not Apply Because the Injunctive Relief Sought Here Is Not Penal in Nature .................................. 30

IV. FINCEN'S ACCESS TO AND USE OF GRAND JURY MATERIALS WAS AUTHORIZED AND PROPER ........................................... 32

A. FinCEN is a "Financial Institution Regulatory Agency" Within the Meaning of Section 3322(b) ........................................... 33

1. The Plain Language of Section 3322(b) Makes Clear that FinCEN Is a "Financial Institution Regulatory Agency"........................ 33

2. The Text of the BSA Also Makes Clear that FinCEN Is a "Financial Institution Regulatory Agency"........................................ 35

B. FinCEN Was Authorized Both to Access and to Use the Grand Jury Information........................................................................ 36

1. Section 3322(b) Contemplates Full Use of Grand Jury Material in an Administrative or Judicial Proceeding ........................ 37

2. The Second Amended Disclosure Order Expressly Authorized FinCEN to Use the Grand Jury Information in any Administrative or Judicial Proceeding ........................................... 38

V. HAIDER'S DUE PROCESS RIGHTS WERE NOT VIOLATED ............ 40

A. Haider Was Not Entitled to Any Process Prior to this Lawsuit Because, to Date, He Has Not Been Deprived of a Cognizable Interest.......................... 43

B. Haider Is Entitled to Discovery and a Trial *De Novo* in this Action, Thus Nullifying His Due Process Arguments........................................................................... 45

    1. Haider Is Entitled to Discovery and a Trial *De Novo* in this Action...................... 46

    2. Haider's Ability to Obtain  Discovery and a Trial *De Novo* Nullifies His Claim that He Has Been Denied Due Process........................................................... 49

C. Even If Haider Was Entitled to Due Process Prior to this Lawsuit, the Process He Received Was More than Sufficient ........................................................... 49

    1. Applicable Legal Standards..................................................................................... 50

    2. The Process that Haider Received Was More than Adequate................................. 51

D. Haider Was Not Denied Due Process Based on Leaks of the Investigation to the Media ............................................................................................................... 61

CONCLUSION ................................................................................................................... 64

# TABLE OF AUTHORITIES

## Federal Cases

*Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692 (D.C. Cir. 2014) .................................. 11

*Am. Consumer Publishing Ass'n, Inc. v. Margosian*, 349 F.3d 1122 (9th Cir. 2003) .................................................................................................... 62, 64

*Am. Cyanamid Co. v. FTC*, 363 F.2d 757 (6th Cir. 1966) .............................. 60

*Am. Gen. Ins. Co. v. FTC*, 589 F.2d 462 (9th Cir. 1979) .................................. 59

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40 (1999) .................................. 42

*Bennett v. City of Holyoke*, 362 F.3d 1 (1st Cir. 2004) ...................................... 35

*Bhd. of Locomotive Firemen & Enginemen v. N. Pac. Ry. Co.*, 274 F.2d 641 (8th Cir. 1960) .................................................................................................... 14

*Boddie v. Connecticut*, 401 U.S. 371, 378 (1971) .............................................. 50

*Brock v. Roadway Express, Inc.*, 481 U.S. 252 (1987) ...................................... 50

*Browder v. United States*, 312 U.S. 335 (1941) ................................................ 37

*Business Commc'ns, Inc. v. U.S. Dep't of Educ.*, 739 F.3d 374 (8th Cir. 2013) ........ 45, 57

*Chernin v. Lyng*, 874 F.2d 501 (8th Cir. 1989) .................................................. 45

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985).............................. 50

*Cook Cnty., Ill. v. United States ex rel. Chandler*, 538 U.S. 119 (2003) ........................ 20

*Cook Inlet Native Ass'n v. Bowen*, 810 F.2d 1471 (9th Cir. 1987) .................................. 35

*Doyle v. Huntress, Inc.*, 419 F.3d 3 (1st Cir. 2005)............................................ 16

*Elkins v. Gallagher*, No. 96-464, 1997 WL 441274 (M.D. Fla. May 30, 1997).............. 62

*E-Shops Corp. v. U.S. Bank Nat'l Ass'n*, 678 F.3d 659 (8th Cir. 2012) ............................ 9

*Farhat v. Jopke*, 370 F.3d 580 (6th Cir. 2004)................................................... 55

*FDIC v. Mallen*, 486 U.S. 230 (1988)................................................................ 44

*Flath v. Garrison Pub. Sch. Dist. No. 51*, 82 F.3d 244 (8th Cir. 1996) ............................ 51

*Gordon v. Hansen*, 168 F.3d 1109 (8th Cir. 1999) .......................................... 42, 58, 60, 61

*Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002) ........................... 27

*In re Grand Jury Proceedings*, 827 F.2d 868 (2d Cir. 1987) ............................................ 33

*In re Sealed Case*, 250 F.3d 764 (D.C. Cir. 2001) ............................................................ 33

*Izzo v. City of Syracuse*, No. 98-0778, 2000 WL 1222014 (N.D.N.Y. Aug. 3, 2000) ................................................................................................................................. 62

*Johnson v. SEC*, 87 F.3d 484 (D.C. Cir. 1996) ................................................................ 30

*Kim v. United States*, 121 F.3d 1269 (9th Cir. 1997) ...................................................... 49

*Linton v. Frederick Cnty. Bd. of County Comm'rs*, 964 F.2d 1436 (4th Cir. 1992) ................................................................................................................................. 56

*Locurto v. Safir*, 264 F.3d 154 (2d Cir. 2001) ................................................................. 55

*Marcus v. Dir., Office Workers' Comp. Programs, U.S. Dept. of Labor*, 548 F.2d 1044 (D.C. Cir. 1976) ............................................................................................ 57

*Marler v. Missouri State Bd. of Optometry*, 102 F.3d 1453 (8th Cir. 1996) ..................... 59

*Marrero v. City of Hialeah*, 625 F.2d 499 (5th Cir. 1980) ............................................... 63

*Matthews v. Eldridge*, 424 U.S. 319 (1976) ................................................. 41, 50, 51, 53

*Mead v. Indep. Ass'n*, 684 F.3d 226 (1st Cir. 2012) ................................................... 62, 64

*Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1 (1978) ........................................ 50

*Miller v. Redwood Tech. Lab., Inc.*, 688 F.3d 928 (8th Cir. 2012) ............................... 9, 41

*Moore v. King Cnty. Fire Protection Dist. No. 26*, 327 F. App'x 5 (9th Cir. 2009) ................................................................................................................................. 57

*Moore v. United States*, No. 13-2063, 2015 WL 15100075 (W.D. Wash. Apr. 1, 2015) ................................................................................................................... passim

*Moore v. United States*, No. 13-2063, 2015 WL 4508688 (W.D. Wash. July 24, 2015) ................................................................................................................... 25, 49

*Morton v. Mancari*, 417 U.S. 535 (1974) ....................................................................... 20

*Muniz v. Hoffman*, 422 U.S. 454 (1975) ......................................................................... 16

*Nickey v. Mississippi*, 292 U.S. 393 (1934) ....................................................... 49

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014) ............... 37

*Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633 (1990) ......................... 23

*Russello v. United States*, 464 U.S. 16 (1983) ................................................... 14

*Sadallah v. City of Utica*, 383 F.3d 34 (2d Cir. 2004) ..................................... 62

*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007) ....................................... 12

*Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811 (8th Cir. 2011) ..................... 50

*SEC v. Berry*, 580 F. Supp. 2d 911 (N.D. Cal. 2008) ................................. 27, 28

*SEC v. Jones*, 476 F. Supp. 2d 374 (S.D.N.Y. 2007) ..................................... 30

*SEC v. Kelly*, 663 F. Supp. 2d 276 (S.D.N.Y. 2009) ..................................... 27

*SEC v. McCaskey*, 56 F. Supp. 2d 323 (S.D.N.Y. 1999) ................................. 27

*SEC v. Ogle*, No. 99 C 609, 2000 WL 45260 (N.D. Ill. Jan. 11, 2000) ............ 27

*SEC v. Quinlan*, 373 F. App'x 581 (6th Cir. 2010) ....................................... 30

*Shands v. City of Kennett*, 993 F.2d 1337 (8th Cir. 1993) ......................... 62, 63

*Springer v. Gov't of Philippine Islands*, 277 U.S. 189 (1928) ..................... 14, 15

*Sullivan v. State of New Jersey*, 602 F. Supp. 1216 (D.N.J. 1985) ................. 63

*Tarrant Reg'l Water Dist. v. Hermann*, 133 S. Ct. 2120 (2013) ..................... 14

*Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978) ..................................... 20

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) ................................. 44

*Timmy S. v. Stumbo*, 537 F. Supp. 39 (E.D. Ky. 1981) ................................. 43

*Trailer Marine Transp. Corp. v. Fed. Mar. Comm'n,* 602 F.2d 379 (D.C. Cir. 1979) .................................................................................................................... 17

*TRM, Inc. v. United States*, 52 F.3d 941 (11th Cir. 1995) ............................. 49

*United States v. Banks*, 115 F.3d 916 (11th Cir. 1997) ................................. 27

*United States v. Capital Tax Corp.*, No. 04-4138, 2007 WL 488084 (N.D. Ill. Feb. 8, 2007).................................................................................. 44

*United States v. Councilman*, 418 F.3d 67 (1st Cir. 2005)................................. 14

*United States v. Hom*, 45 F. Supp. 3d 1175 (N.D. Cal. 2014)........................... 48

*United States v. Maxi Switch, Inc.*, 18 F. Supp. 2d 1040 (Ct. Int'l Trade 1998)......... 41, 49

*United States v. McBride*, 908 F. Supp. 2d 1186 (D. Utah 2012) .............................. 12, 25

*United States v. Mead Corp.*, 533 U.S. 218 (2001)......................................... 19

*United States v. S.A.*, 129 F.3d 995 (8th Cir. 1997) ....................................... 10

*United States v. Standard Accident Ins. Co.*, 280 F.2d 445 (1st Cir. 1960)...................... 17

*United States v. Williams*, 489 F. App'x 655 (4th Cir. 2012) .................................... 12, 48

*United States v. Williams*, No. 09-437, 2014 WL 3746497 (E.D. Va. June 26, 2014)............................................................................................... 25

*United States v. Williams*, No. 1:09-cv-437, 2010 WL 3473311 (E.D.N.Y. Sept. 1, 2010).................................................................................. 47, 48

*Utica Packing Co. v. Block*, 781 F.2d 71 (6th Cir. 1986) ................................. 60

*Vega v. Lantz*, 596 F.3d 77 (2d Cir. 2010) ...................................................... 63

*Walker v. City of Berkeley*, 951 F.2d 182 (9th Cir. 1991)................................. 59

*Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305 (1985).............................. 16

*Watt v. Alaska*, 451 U.S. 259 (1981) .............................................................. 15

*William Jefferson & Co. v. Bd. of Assessment & Appeals*, 695 F.3d 960 (9th Cir. 2012)............................................................................................ 59

Williams v. Dep't of Labor, 879 F.2d 327 (8th Cir. 1989) .................................. 59

*Withrow v. Larkin*, 421 U.S. 35 (1975) .......................................................... 59

*WMX Techs., Inc. v. Miller*, 80 F.3d 1315 (9th Cir. 1996)................................. 63

**Federal Statutes**
12 U.S.C. § 3301 ......................................................................................... 36

12 U.S.C. § 3302 ....................................................................................... 36

18 U.S.C. § 212 ......................................................................................... 36

18 U.S.C. § 3322 .................................................................................. passim

28 U.S.C. § 2462 ....................................................................................... 26

31 U.S.C. § 310 ......................................................................................... 34

31 U.S.C. § 5311 ................................................................................... 1, 34

31 U.S.C. § 5312 ....................................................................................... 35

31 U.S.C. § 5314 ....................................................................................... 11

31 U.S.C. § 5315 ................................................................................. 11, 13

31 U.S.C. § 5318 .................................................................................. passim

31 U.S.C. § 5320 ....................................................................................... 26

31 U.S.C. § 5321 .................................................................................. passim

**Federal Rules**
Fed. R. Crim. P. 6 ............................................................................... 33, 38

**Federal Regulations**
31 C.F.R. § 1010.810 ................................................................................. 34

31 C.F.R. § 1010.820(a)-(h) ................................................................ 20, 21

31 C.F.R. § 1022.210(d)(2) ....................................................................... 12

31 C.F.R. § 1022.320 ........................................................................... 21, 22

31 C.F.R. § 103.125(d)(2) ................................................................... 11, 12

**Other Authorities**
1970 U.S.C.C.A.N. 4394 ........................................................................... 46

1982 U.S.C.C.A.N. 1895 ........................................................................... 18

H.R. Rep. 101-54(I) .................................................................................. 40

H.R. Rep. 97-651 (1982) ........................................................................... 18

H.R. Rep. No. 105-358 ....................................................... 36

H.R. Rep. No. 91-975 (1970) ............................................. 46

Merriam-Webster's Collegiate Dictionary (10th ed. 2001) ............................................. 37

Pub. L. 91-508 § 207 (Oct. 26, 1970)............................................. 15

Pub. L. 97-258 (Sept. 13, 1982) ............................................. 16

Treasury Order 180-01 ....................................................... 34

Plaintiff the United States Department of the Treasury, by its attorney, the United States Attorney for the District of Minnesota (the "Government" or "Treasury Department"), respectfully submits this memorandum in opposition to the motion to dismiss of defendant Thomas E. Haider ("Haider").

## PRELIMINARY STATEMENT

From 2003 through May 2008, Haider was the Chief Compliance Officer of MoneyGram International Inc. ("MoneyGram" or the "Company"). As MoneyGram's Chief Compliance Officer, Haider was responsible for ensuring that MoneyGram complied with its obligations under the Bank Secrecy Act (the "BSA"), 31 U.S.C. § 5311 *et seq.*, to implement and maintain an effective anti-money laundering ("AML") program and to file with the Financial Crimes Enforcement Network ("FinCEN") timely suspicious activity reports ("SARs"). Notwithstanding these responsibilities, at all times relevant to this case, Haider failed to ensure that MoneyGram implemented and maintained an effective AML program, and fulfilled its obligation to file timely SARs. As a result of these compliance failures — to which MoneyGram has already admitted — innocent customers of MoneyGram suffered substantial losses, as they were duped into using MoneyGram's money transfer system to send significant sums of money to perpetrators of fraudulent schemes.

In December 2014, FinCEN assessed a civil money penalty of $1 million against Haider (the "Assessment"), arising out of MoneyGram's above-referenced compliance failures. Through this action, FinCEN is seeking to reduce that penalty to judgment, and also to obtain an injunction against Haider prohibiting him from participating in the

conduct of the affairs of any "financial institution" (as that term is defined in the BSA), for a term of years sufficient to prevent future harm to the public (the "Injunction").

In his motion to dismiss, Haider does not even try to argue that the Complaint's allegations are insufficient to show that, under his leadership, MoneyGram had a deficient AML program and failed to file timely SARs. Instead, he argues that FinCEN's claims against him should be dismissed because, according to Haider, (1) the BSA does not provide for individual liability for AML program violations, (2) the Assessment did not expressly apportion the $1 million penalty between FinCEN's AML program claim and its SAR-filing claim, (3) FinCEN's request for injunctive relief is time-barred, (4) FinCEN's claims are based on grand jury information to which it should not have been granted access, and (5) the procedures that FinCEN used prior to issuing the Assessment violated his due process rights.

As demonstrated below, none of these arguments has merit. *First*, Haider's assertion that individuals may not be held liable for AML program violations is inconsistent with the text of the BSA and the unambiguous intent of Congress. (*Infra* Part I.) *Second*, the facts alleged in the Assessment support a penalty of well over $1 million as to each of FinCEN's claims. (*Infra* Part II.) *Third*, FinCEN's request for injunctive relief is timely for a variety of reasons, including because in a Government enforcement action, a claim for injunctive relief is not subject to any statute of limitations. (*Infra* Part III.) *Fourth*, FinCEN's access to and use of grand jury information was authorized and proper under 18 U.S.C. § 3322(b). (*Infra* Part IV.) *Finally*, Haider's due process arguments fail for a number of reasons, including because

(1) to date, he has not been deprived of a cognizable property interest, and (2) his own submissions (which improperly rely on information that is extraneous to the Complaint and not properly considered on a motion to dismiss) establish that the process he received was sufficient. (*Infra* Part V.) Accordingly, Haider's motion to dismiss should be denied.

## BACKGROUND

### A. MoneyGram's Money Transfer Business

Since at least 2003, MoneyGram has operated a money transfer service that enables customers to transfer money from one location to another through a global network of agents and outlets. (Compl. ¶¶ 1, 30.) MoneyGram outlets are independently-owned entities (such as convenience stores) that are authorized to transfer money through MoneyGram's money transfer system. (*Id.* ¶¶ 1, 31.) MoneyGram agents are the owners and/or operators of such outlets. (*Id.* ¶¶ 1, 32.)

As a money transmitter, MoneyGram is subject to, and must comply with, various requirements set forth in the BSA. (*Id.* ¶ 2.) As relevant here — and at all times relevant to this enforcement action — MoneyGram was required to implement and maintain an effective AML program. (*Id.* ¶¶ 2, 16-22.) MoneyGram was also required to file with FinCEN timely SARs, identifying money transfers that MoneyGram knew, suspected, or had reason to suspect involved the use of its money transfer system to facilitate criminal activity. (Compl. ¶¶ 2, 23-25); 31 U.S.C. § 5318(g).

MoneyGram's Chief Compliance Officer was responsible for ensuring that the Company implemented and maintained an effective AML program and complied with its

obligations to file timely SARs.  (Compl. ¶¶ 3, 47-48.)  From at least 2003 through May 2008, Haider was MoneyGram's Chief Compliance Officer and supervised MoneyGram's AML Compliance and Fraud Departments.  (*Id.* ¶¶ 3, 46.)  Beginning in 2006, and continuing throughout the remainder of his employment at MoneyGram, Haider was a member of MoneyGram's Senior Leadership Team, an executive management group whose members reported directly to MoneyGram's Chief Executive Officer.  (*Id.* ¶ 51.)

### B.  Haider Failed to Ensure that MoneyGram Implemented And Maintained an Effective AML Program or Fulfilled Its Obligation to File Timely SARs

Notwithstanding Haider's obligations as MoneyGram's Chief Compliance Officer, at all times relevant to this enforcement action, Haider failed to ensure that MoneyGram (1) implemented and maintained an effective AML program and (2) fulfilled its obligation to file timely SARs.  (*Id.* ¶ 4.)  Haider's failures included the following:

**Failure to Implement a Discipline Policy.**  Haider failed to implement a policy for disciplining agents and outlets that MoneyGram personnel knew or suspected were involved in fraud and/or money laundering.  (*Id.*)  This failure was particularly egregious because, *inter alia*, (1) in March and April 2007, Haider was presented with compelling evidence that significant numbers of MoneyGram agents were complicit in schemes that used MoneyGram's money transfer system to defraud consumers (*id.* ¶¶ 78-85); (2) in March 2007, MoneyGram's Fraud Department proposed an agent termination policy to Haider (*id.* ¶¶ 70-71); (3) in April 2007, MoneyGram told one of its regulators, the Federal Trade Commission, that due to concerns about certain of its agents, it planned to

institute an agent discipline policy (*id.* ¶ 72); and (4) in August 2007, MoneyGram's Director of Fraud, who reported to Haider, recommended that MoneyGram "implement [a] Fraud Agent Closure Policy" (*id.* ¶ 73).

**Failure to Terminate Known High-Risk Agents/Outlets.**  Haider failed to ensure that MoneyGram terminated agents and outlets that MoneyGram personnel understood were involved in fraud and/or money laundering, including outlets that Haider himself was on notice, posed an unreasonable risk of fraud and/or money laundering.  (*Id.* ¶¶ 4, 86.)  For example, from May 2007 through May 2008 (when Haider left MoneyGram), MoneyGram received compelling evidence that at least some of the same agents that had been flagged for Haider in March and April 2007 as likely complicit in consumer fraud schemes were continuing to participate in such schemes.  (*See id.* ¶ 93.)  With respect to one of those agents, "Money Spot," Haider had been told in August 2004 that "Toronto PD . . . think[s] this agent is dirty."  (*Id.* ¶ 88.)  In 2009, the owner of Money Spot, James Ugoh — who, under Haider's oversight, was permitted to operate 12 MoneyGram outlets — was charged with, and ultimately pled guilty to, various crimes relating to consumer fraud at his MoneyGram outlets.  (*See id.* ¶¶ 120, 122, 124.)  In connection with this prosecution, Ugoh admitted that almost all of the money that his outlets received through MoneyGram money transfers — approximately $27 million — constituted fraud proceeds.  (*Id.* ¶ 120.)

**Failure to File Timely SARs.**  Haider failed to ensure that MoneyGram fulfilled its obligation to file timely SARs, including because Haider maintained MoneyGram's AML program so that the individuals responsible for filing SARs ("SAR analysts") were

not provided with information possessed by MoneyGram's Fraud Department that should have resulted in the filing of SARs on specific agents or outlets. (*Id.* ¶¶ 4, 96-101, 113-26.) Haider's failure to ensure that the Fraud Department provided relevant information to MoneyGram's SAR analysts was contrary to guidance he had previously received from one of MoneyGram's external AML consultants. (*Id.* ¶ 97.) As a result of Haider's SAR-related failures, there were numerous agents/outlets that had accumulated an extraordinary number of consumer fraud reports and/or that members of the Fraud Department had identified as likely participating in fraud and/or money laundering, but for which MoneyGram: (1) did not file any SARs; (2) filed SARs, but exceedingly late; or (3) filed SARs, but improperly identified the suspect agents/outlets merely as the transaction locations (*i.e.*, the physical locations where the suspicious activity had taken place), rather than the subjects of the SARs (*i.e.*, the suspected wrongdoers). (*See id.* ¶¶ 113-26.)

**Failure to Conduct Effective Audits of Agents/Outlets.** Haider failed to ensure that MoneyGram conducted effective audits of agents and outlets, including outlets that MoneyGram personnel knew or suspected were involved in fraud and/or money laundering. (*Id.* ¶¶ 4, 102-08.) For example, Money Spot was not audited during Haider's employment at MoneyGram. (*Id.* ¶ 104.)

**Failure to Conduct Adequate Due Diligence on Agents/Outlets.** Haider failed to ensure that MoneyGram conducted adequate due diligence on prospective agents, or existing agents seeking to open additional outlets, which resulted in, *inter alia*, MoneyGram (1) granting outlets to agents who had previously been terminated by other

money transmission companies, and (2) granting additional outlets to agents who MoneyGram personnel knew or suspected were involved in fraud and/or money laundering.  (*Id.* ¶¶ 4, 109-12.)  For example, the owner of Money Spot, James Ugoh, was permitted to operate one of his 12 outlets ("Money Spot 9") out of a house in a residential neighborhood, and two of his outlets ("Money Spot 5" and "Money Spot 7") in locations only a few feet away from one another.  (*Id.* ¶ 110.)

### C. Haider's Compliance Failures Resulted in Substantial Losses to Victim Consumers

As a result of Haider's compliance failures, agents and outlets that MoneyGram personnel knew or suspected were involved in fraud and/or money laundering were allowed to continue to use MoneyGram's money transfer system to facilitate their fraudulent schemes.  (*Id.* ¶ 5.)  For example, from May 2007 through May 2008, four of the outlets that had been flagged for Haider in March and April 2007 as likely complicit in consumer fraud schemes — each of which was owned or operated by Ugoh — were reported to MoneyGram (by its customers) as the receiving agents for more than 450 fraud-induced money transfers.  (*See id.* ¶ 93.)  Those money transfers alone resulted in approximately $800,000 in consumer losses.  (*Id.*)

### D. MoneyGram Has Already Admitted that, Under Haider, It Lacked an Effective AML Program

In November 2012, MoneyGram entered into a Deferred Prosecution Agreement ("DPA") with the Department of Justice on charges of, *inter alia*, willfully failing to implement an effective AML program, in violation of 31 U.S.C. § 5318(h).  (*Id.* ¶ 62.) As part of the DPA, MoneyGram agreed to forfeit $100 million.  (*Id.*)  MoneyGram also

admitted, *inter alia*, that it had "willfully failed to maintain an effective [AML] program that was reasonably designed to prevent it from being used to facilitate money laundering." (*Id.* at ¶ 63.) The specific programmatic failures to which MoneyGram admitted correspond to the failures that form the basis of the Government's claims here. (*See id.*)

### E. FinCEN's Assessment Against Haider

On December 18, 2014, FinCEN assessed a civil money penalty against Haider in the amount of $1 million, based on his willful failure to ensure that MoneyGram (1) implemented and maintained an effective AML program, and (2) filed timely SARs. (*Id.* ¶ 64; Decl. of Jessica Jean Hu ("Hu Decl.") Ex. A.) FinCEN and Haider had previously entered into a series of tolling agreements, pursuant to which they agreed that any statute of limitations applicable to the claims at issue here would be tolled from November 15, 2013, through December 19, 2014. (Compl. ¶ 65.) Accordingly, FinCEN was entitled to base its Assessment against Haider on conduct occurring from November 15, 2007, through the date of Haider's separation from MoneyGram — on or about May 23, 2008 (the "Tolling Period"). (*Id.*); *see* 31 U.S.C. § 5321(b).

Haider's failure to ensure that MoneyGram implemented and maintained an effective AML program during the Tolling Period rendered him subject to a penalty of $25,000 per day. (Comp. ¶ 66); *see* 31 U.S.C. § 5321(a). Similarly, Haider's failure to ensure that MoneyGram fulfilled its obligation to file timely SARs during the Tolling Period rendered him subject to a penalty of at least $25,000 per violation. *Id.* The Tolling Period is approximately 190 days (Compl. ¶ 67), and the Complaint identifies

hundreds of instances where, under Haider, MoneyGram failed to file timely SARs (*see id.* ¶¶ 113-126). Accordingly, the full amount of the assessed penalty was justified as to either of FinCEN's claims (*i.e.*, its AML program claim or its SAR-filing claim).

## STANDARD OF REVIEW

To withstand a motion to dismiss, a complaint need only "contain sufficient factual allegations to state a claim to relief that is plausible on its face." *E-Shops Corp. v. U.S. Bank Nat'l Ass'n*, 678 F.3d 659, 663 (8th Cir. 2012). Although "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," a court must construe "all facts alleged in the complaint as true, and make[] reasonable inferences in favor of the nonmoving party." *Id.* at 662. In deciding a motion to dismiss, a court may consider only the complaint, documents fairly encompassed within the complaint, and matters subject to judicial notice. *See Miller v. Redwood Tech. Lab., Inc.*, 688 F.3d 928, 931 (8th Cir. 2012).

## ARGUMENT

I.  **THE COMPLAINT ADEQUATELY PLEADS A CLAIM AGAINST HAIDER UNDER 31 U.S.C. § 5321(a)(1) FOR VIOLATIONS OF 31 U.S.C. § 5318(h)**

Haider asserts that FinCEN's claim based on his failure to ensure that MoneyGram implemented and maintained an effective AML program fails because individuals purportedly cannot be held liable under the BSA's penalty provision, 31 U.S.C. § 5321(a)(1) ("Section 5321(a)(1)"), for violations of the AML program requirement, 31 U.S.C. § 5318(h) ("Section 5318(h)"). (*See* Thomas E. Haider Mem. Law Supp. Mot. Dismiss ("Mem.") 13-22.) This argument, however, ignores the plain language of

9

Section 5321(a)(1) and the unambiguous intent of Congress, which make clear that individuals are properly subject to liability for willful violations of Section 5318(h).  (*See infra* Part I.A-B.)

### A. The Plain Language of Section 5321(a)(1) Makes Clear That Individuals Are Subject to Civil Penalties for Violations of Section 5318(h)

The Court's "starting point in interpreting a statute is always the language of the statute itself."  *United States v. S.A.*, 129 F.3d 995, 998 (8th Cir. 1997).  "If the plain language of the statute is unambiguous," and "the intent of Congress can be clearly discerned from the statute's language, the judicial inquiry must end."  *Id.*  Haider focuses his argument that individuals cannot be held liable for violating Section 5318(h) on the language of that provision.[1]  (*See* Mem. 13-15.)  But the Government's claim is brought pursuant to Section 5321(a)(1), whose plain language unambiguously provides for the imposition of civil penalties on individuals for willful violations of the vast majority of BSA provisions, including Section 5318(h).  Section 5321(a)(1) states in relevant part:

> A domestic financial institution or nonfinancial trade or business, *and a partner, director, officer, or employee of a domestic financial institution or nonfinancial trade or business*, willfully violating this subchapter or a regulation prescribed or order issued under this subchapter (except sections 5314 and 5315 of this title or a regulation prescribed under sections 5314 and 5315) . . . is liable to the United States Government for a civil penalty . . . .

---

[1] Section 5318(h) states in relevant part:

(1) In general.—In order to guard against money laundering through financial institutions, each financial institution shall establish anti-money laundering programs, including, at a minimum—
    (A)    The development of internal policies, procedures, and controls;
    (B)    The designation of a compliance officer;
    (C)    An ongoing employee training program; and
    (D)    An independent audit function to test programs.

31 U.S.C. § 5321(a) (emphasis added). The statute's explicit reference to "partner[s], director[s], officer[s], and employee[s]" makes clear that Congress intended these categories of individuals to be subject to liability under Section 5321(a)(1) in connection with a violation of any provision of the BSA or its regulations, excluding the specifically excepted provisions (*i.e.*, 31 U.S.C. §§ 5314 and 5315). Because Section 5318(h) is not listed as one of those exceptions, the plain language of the statute makes clear that a civil penalty may be imposed on an individual like Haider, who (as alleged in the complaint) was both an "officer" and "employee" of a covered institution (*i.e.*, MoneyGram). (Compl. ¶ 13.)

While Haider acknowledges that Section 5318(h) is not listed as an exception to Section 5321(a)(1), he argues against this common-sense interpretation of the statute on the grounds that (1) Section 5318(h) does not expressly impose obligations on individuals and (2) "'the basic principle of statutory construction is that a specific statute . . . controls over a general provision . . . particularly when the two are interrelated and closely positioned.'" (*See* Mem. 18-19 (quoting *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 698 (D.C. Cir. 2014)).) In making this argument, however, Haider ignores that this principle of statutory construction applies only when "the compared statutes are irreconcilably conflicting." *Adirondack Med. Ctr.*, 740 F.3d at 698.

Here, Sections 5321(a)(1) and 5318(h) are on their face not "irreconcilably conflicting." Section 5318(h) (together with its implementing regulation, 31 C.F.R. § 103.125, *recodified at* 31 C.F.R. § 1022.210) requires that each financial institution

establish an effective AML program (which includes "designati[ng] a compliance

officer"), and Section 5321(a)(1) logically imposes liability on both individuals and

entities (including compliance officers) in connection with willful violations of Section

5318(h).[2]  Having enacted a statute that requires each financial institution to implement

an effective AML program and to designate a compliance officer to oversee the program,

it is logical — not "irreconcilably conflicting" — to read the corresponding penalty

provision as subjecting compliance officers to liability for willful violations of the

statute.[3]

If anything, it is Haider's proposed reading of the statutory scheme that would

create ambiguity and produce "irreconcilably conflicting" results.  As an initial matter,

applying Haider's reading — that liability for violations of Section 5318(h) is limited to

financial institutions because that subsection does not expressly impose obligations on

individuals (Mem. 13-15) — would dramatically expand the short and finite list of

---

[2] The fact that an individual must act "willfully" to be held liable under Section 5321(a)(1) negates Haider's argument that Congress could not have "intend[ed] to penalize individuals for each and every BSA violation."  (*Cf.* Mem. 17.)  Before liability can attach to an individual under Section 5321(a)(1), the Government must show that, under the circumstances, the individual's conduct was at least reckless.  *See, e.g.*, *United States v. Williams*, 489 F. App'x 655, 658, 660 (4th Cir. 2012); *United States v. McBride*, 908 F. Supp. 2d 1186, 1204-05 (D. Utah 2012); *see generally Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57-58 (2007) ("where willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well").

[3] The regulation implementing Section 5318(h) supports this conclusion, as it requires that a financial institution have a compliance officer whose responsibilities include, *inter alia*, "assuring that . . . [the financial institution's AML] program is updated as necessary to reflect current requirements of [the BSA] and related guidance issued by the Department of the Treasury."  31 C.F.R. § 103.125(d)(2), *recodified at* 31 C.F.R. § 1022.210(d)(2).

exceptions set forth in Section 5321(a)(1).  Haider's reading effectively grafts onto the

statute additional carve-out language (which is bracketed and italicized below):

> [A] partner, director, officer, or employee of a domestic financial institution . . .
> willfully violating this subchapter (except sections 5314 and 5315 of this title or a
> regulation prescribed under sections 5314 and 5315[*, as well as any other
> provision which does not explicitly impose obligations on individuals*]) . . . is
> liable to the United States Government for a civil penalty . . . .

Nothing in the text of the statute supports such a broad expansion of the enumerated

provisions excluded under Section 5321(a)(1).  Moreover, Haider's construction would

render the statute's explicit exclusion of Section 5315 duplicative and unnecessary.  Like

Section 5318(h), Section 5315 does not expressly impose obligations on individuals.  *See*

31 U.S.C. § 5315.  Haider himself acknowledges this point.  (Lee Decl. Ex. 2 (omitting

Section 5315 from list of "Individual Liability Provisions").)  Accordingly, under

Haider's proposed reading, there would have been no need to individually carve out

Section 5315 from Section 5321(a)(1).

More importantly, Haider's reading would also be irreconcilable with at least one

other provision of the statute, namely Section 5321(a)(3).  Section 5321(a)(3) states that

"[a] person not filing a report under a regulation prescribed under section 5315 of this

title . . . is liable to the Government for a civil penalty of not more than $10,000."  Yet, as

noted above and acknowledged by Haider, Section 5315, like Section 5318(h), does not

expressly impose obligations on individuals.  This accordingly shows that a BSA

provision need not expressly impose obligations on individuals in order for liability for

violations of the provision to attach to individuals.

Haider further argues that because other subsections of Section 5318 impose specific obligations on individuals, the absence of such language in subparagraph (h) should lead the Court to adopt a narrower view of individual liability under Section 5321(a)(1). (*See* Mem. 15 (citing *Russello v. United States*, 464 U.S. 16, 23 (1983).)[4] This argument is unavailing. The Supreme Court has held that this canon of statutory interpretation is subject to exceptions, including where, as here, its application would "fail[] to account for other sections of the [statute] that cut against [such a] reading." *Tarrant Reg'l Water Dist. v. Hermann*, 133 S. Ct. 2120, 2131-32 (2013) (declining to apply *Russello*). In addition, "[t]he general rule that the expression of one thing is the exclusion of others is subject to exceptions. Like other canons of statutory construction it is only an aid in the ascertainment of the meaning of the law, and must yield whenever a contrary intention on the part of the lawmaker is apparent." *Springer v. Gov't of Philippine Islands*, 277 U.S. 189, 206 (1928); s*ee also Bhd. of Locomotive Firemen & Enginemen v. N. Pac. Ry. Co.*, 274 F.2d 641, 646 (8th Cir. 1960) ("Courts should, if possible, heed the intention and purpose of Congress in enacting legislation."). As set forth above, the plain language of Section 5321 "cut[s] against" Haider's reading of the statute. Moreover, as demonstrated below, Congress has made clear its intent that individuals may be held liable under Section 5321(a)(1) for violations of Section 5318(h).

---

[4] Haider's reliance on this canon of construction undermines his argument that the statute's plain language leads inexorably to his interpretation, as "[r]eliance on a canon of construction to support the inference belies the availability of a plain text argument." *United States v. Councilman*, 418 F.3d 67, 73 (1st Cir. 2005).

Haider's reading must "yield [to this] contrary intention on the part of the lawmaker."

*Springer*, 277 U.S. at 206.

### B. Congress Has Made Clear Its Intent that Individuals Are Properly Subject to Liability Under Section 5321(a)(1) for Violations of Section 5318(h)

While "the starting point in every case involving construction of a statute is the language itself," that is not "a rule of law, and does not preclude consideration of persuasive evidence if it exists." *Watt v. Alaska*, 451 U.S. 259, 266 (1981). Here, the recodification history of Section 5321 makes clear that Congress has always intended for there to be individual liability under Section 5321(a)(1) for violations of Section 5318(h).

### 1. As Originally Enacted, Section 5321(a)(1) Explicitly Provided For Individual Liability

As originally enacted, Section 5321(a)(1) stated:

> For each willful violation of this title, the Secretary may assess upon any domestic financial institution, *and upon any partner, director, officer, or employee thereof who willfully participates in the violation*, a civil penalty . . . .

Pub. L. 91-508 § 207 (Oct. 26, 1970), 62 Stat. 749 (emphasis added). The fact that, as originally enacted, Section 5321(a)(1) explicitly provided for liability for individuals who "willfully participate[]" in their associated financial institution's "violation" establishes Congress's intent from the outset to render individuals broadly liable for willful violations of all provisions of the BSA (absent an express exception).

### 2. In Recodifying Section 5321(a)(1), Congress Made Clear that It Did Not Intend to Make Any Substantive Changes to the Statute

In 1982, the BSA was recodified, and the language of Section 5321(a)(1) was modified to its current wording. Although the current wording does not include the prior

"willful[] participat[ion]" phrase, when Congress recodified the statute, it made clear that its intention was not to make any substantive changes to the statute, much less to drastically alter (and substantially reduce) the scope of individual liability.  Indeed, the title of the recodified statute states explicitly:  "An Act to revise, codify, and enact *without substantive change* certain general and permanent laws, related to money and finance, as title 31, United States Code, 'Money and Finance.'"  Pub. L. 97-258 (Sept. 13, 1982) (emphasis added).  If that were not enough to dispel any notion of intent to change the statute, the text of the recodified statute itself reiterates this point:

> Sections 1 – 3 of this Act . . . restate, *without substantive change*, laws enacted before April 16, 1982 that were replaced by those sections.  Those sections may *not* be construed as making a substantive change in the laws replaced.

*Id.*, 96 Stat. 877 (emphases added).  Section 5321(a)(1) appears in Section 1 of the recodified Act.  *Id.*  The recodification thus clearly disclaimed any intent to substantively change the original statutory language.  Such an explicit disclaimer gives further weight to the strong presumption that the recodification should not be interpreted as substantively altering the law, as "it is well established that there is a presumption against change in codification statutes."  *Doyle v. Huntress, Inc.*, 419 F.3d 3, 8 (1st Cir. 2005).  Indeed, "[i]t will not be inferred that Congress, in revising and consolidating laws, intended to change their effect, unless such intention is clearly expressed."  *Id.*; *Muniz v. Hoffman*, 422 U.S. 454, 470 (1975) ("It will not be inferred that the legislature, in revising and consolidating the laws, intended to change their policy, unless such intention be clearly expressed."); *see also Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 318 (1985) (noting that absent "substantive comment," "it is generally held

that a change during codification is not intended to alter the statute's scope"); *United States v. Standard Accident Ins. Co.*, 280 F.2d 445, 447 (1st Cir. 1960) ("There is a presumption that codification is not intended to make changes of substantive law. . . . This is particularly true where, as here, the legislative history shows a positive disclaimer of any such intent . . . .").

In the face of explicit disclaimer language, the presumption against substantive change is so strong that it should override even an appearance of substantive change that may result from recodification. In *Trailer Marine Transp. Corp. v. Fed. Mar. Comm'n*, the D.C. Circuit held that where "Congress explicitly provided that language of the recodified Act 'may not be construed as making a substantive change in the laws replaced,'" it would be "untenable" to read the recodification as "mean[ing] something different from . . . the original Act," because "the express mission of the recodifiers [was] to alter no substantive provision or meaning of the original statute." 602 F.2d 379, 389 (D.C. Cir. 1979). Given that a narrowing of the scope of liability (particularly the dramatic narrowing advocated for here) would certainly constitute a substantive change, the presumption against substantive change should control, and Section 5321(a)(1) should be read in a manner consistent with its original language, which explicitly provided for individual "participat[ion]" liability.

Moreover, such a reading of congressional intent is further supported by the House Report that accompanied the recodification, which mentions in no fewer than five separate paragraphs that the recodification does not make "substantive" changes to the

17

law.  H.R. Rep. 97-651 at 1-4 (1982), *reprinted in* 1982 U.S.C.C.A.N. 1895, 1895-97, 1900.[5]  The House Report further notes that:

> It is sometimes feared that mere changes in terminology and style will result in changes in substance. . . . This fear might have some weight if this were the usual kind of amendatory legislation. . . . In a codification law, however, the courts uphold the contrary presumption: the law is intended to remain substantively unchanged.

1982 U.S.C.C.A.N. at 1897.  The House Report therefore further evinces the clear legislative intention that the substantive operation of Section 5321(a)(1) be unaltered following its recodification and that individuals remain liable for willful violations of all subsections of the BSA under that provision, absent an express exception.

In light of all of the above, the Government does not believe that there is ambiguity with respect to whether individuals are properly subject to liability under Section 5321(a)(1) for willful violations of Section 5318(h).  However, to the extent there is ambiguity, it should be resolved in favor of the agency's position.  Reading Section 5321(a)(1) as imposing liability on individuals for willful violations of Section 5318(h) is not only consistent with Section 5321(a)(1)'s text and recodification history, but also (1) serves the important law enforcement purpose of holding responsible those who willfully

---

[5] *See* 1982 U.S.C.C.A.N. at 1895 ("to revise, codify, and enact without substantive change certain general and permanent laws related to money and finance . . . . The purpose of the bill is to restate in comprehensive form, without substantive change . . . ."); *id.* at 1896 ("Precautions have been taken against making substantive changes in the law."); *id.* at 1897 ("Substantive change not made – As in other codifications undertaken to enact into positive law all titles of the U.S.C. this bill makes no substantive change in the law."); *id.* at 1900 ("Since the purpose of H.R. 6128 is to codify changes in the law without making any substantive change in the law, no oversight findings or recommendations have been made with respect to the bill.").

participate in violations of the AML program requirement and (2) is consistent with FinCEN's past practice.[6]  Accordingly, FinCEN's position is entitled to deference.  *See United States v. Mead Corp.*, 533 U.S. 218, 227 (2001) (in deciding the degree of weight to accord to an agency's construction of a statute, courts look to "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade").

## C. Haider's Remaining Arguments for Why Section 5321(a)(1) Should Not Be Read as Imposing Liability on Individuals for Violations of Section 5318(h) Are Unavailing

Haider offers three additional arguments for why Section 5321(a)(1) should not be read as imposing liability on individuals for violations of Section 5318(h), none of which has merit.

### 1. Subsequent Amendments to Other Provisions of the BSA Did Not Alter the Scope of Section 5321(a)(1)

Haider argues that the legislative history of other BSA provisions, such as those enacted by the Money Laundering Suppression Act of 1994 and the USA PATRIOT ACT of 2001, suggest that Section 5321(a)(1) should not be applied to penalize individuals for violations of Section 5318(h).  (*See* Mem. 15-19.)  At bottom, Haider's position is that subsequent, unrelated amendments to the BSA have somehow, by

---

[6] The following are prior FinCEN enforcement actions against individuals arising out of failures to implement an effective AML program:  *In re New Milenium Cash Exchange, Inc. and Flor Angella Lopez*, No. 2014-03 (Apr. 23, 2014);  *In re Saleh H. Adam dba Adam Serv.*, No. 2014-02 (FinCEN Feb. 7, 2014); *In re Tonkawa Tribe of Okla. and Edward E. Street*, No. 2006-01 (FinCEN Mar. 24, 2006).  These examples are available at *http://www.fincen.gov/news_room/ea/*.

implication, repealed Congress's express intent to impose liability on individuals for a broad array of BSA violations, including violations of Section 5318(h). This position is at odds with decades of settled Supreme Court authority.

The Supreme Court has consistently held that congressional repeals by implication are disfavored and must be "clear and manifest." *See Morton v. Mancari*, 417 U.S. 535, 550 (1974) ("In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable."); *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 189 (1978) ("In practical terms, this 'cardinal rule' means that in the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable."); *Cook Cnty., Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 133 (2003) (relying on "the cardinal rule that repeals by implication are not favored"). Given that such a clear and manifest intention to repeal is not evidenced here, and, to the contrary, Congress has instead expressed an intention to preserve the scope of Section 5321(a)(1) as originally enacted, Haider's arguments which rely on other amendments to the BSA are unavailing.

> 2. 31 C.F.R. § 1010.820 Does Not Undermine the Conclusion that Individuals Are Properly Subject to Liability Under Section 5321(a)(1) for Violations of Section 5318(h)

Haider next argues that because the Treasury Department has promulgated a regulation addressing the imposition of penalties on individuals for reporting and recordkeeping violations, *see* 31 C.F.R. § 1010.820(a)-(h), but has not promulgated a similar regulation addressing the imposition of penalties on individuals for AML program

violations, the latter penalties may not be pursued.  (*See* Mem. 19-21.)  As an initial matter, whether there is a regulation providing for the imposition of penalties for AML program violations is irrelevant.  As discussed above, Section 5321(a)(1) provides for the imposition of penalties for AML program violations, and the statute is self-effectuating.  The fact that the Treasury Department has not re-codified in a regulation what the statute already allows — and what Congress has made clear it intended the statute to allow — is of no consequence.

Moreover, Haider's argument mistakenly suggests that the regulation imposing penalties on individuals (the "Penalty Regulation") is comprehensive and excludes from its coverage only AML program violations committed by individuals.  (*See* Mem. 19-21.)  But that is not the case.  The Penalty Regulation addresses only a subset of the violations that Section 5321(a)(1) covers — reporting and recordkeeping violations — and does not purport to be exhaustive.  Therefore, the fact that it does not address a specific type of violation does not mean that the violation cannot be pursued.  Indeed, the Penalty Regulation does not provide for the imposition of penalties against individuals *or entities* for AML program violations, *see* 31 C.F.R. § 1010.820(a)-(h), but there is no dispute that penalties against entities are allowed.

Similarly, Haider's assertion that 31 C.F.R. § 1022.320(a) — the regulation implementing Section 5318(h) (the "AML Regulation") — does not expressly impose obligations on individuals (Mem. 20) is immaterial.  As Haider acknowledges, the AML Regulation merely "tracks [the language of] Section 5318(h)," and like Section 5318(h), it does not address penalties.  However, just because the AML Regulation does not

address penalties does not mean that FinCEN is precluded from seeking penalties for AML program violations. Once again, Haider does not argue that FinCEN is precluded from seeking penalties against *entities* for AML program violations. While the AML Regulation does not provide for the imposition of penalties (against individuals or entities), that is because it does not address the issue of penalties at all. *See* 31 C.F.R. § 1022.320(a)-(g). The Treasury Department simply has not propounded a regulation addressing penalties for AML violations, with respect to individuals or entities. In the absence of such a regulation, Section 5321(a)(1) controls, and for all the reasons discussed above, it allows for penalties against both individuals and entities for AML program violations.[7]

### 3. The Un-Enacted Legislation Haider Cites Is Immaterial

Finally, Haider cites proposed — and ultimately un-enacted — legislation from 2013 that he claims (1) "would have inserted [into Section 5321(a)(1)] the type of language present in the various enforcement statutes that permit individual aiding and abetting liability," and therefore (2) supports his argument that Section 5321(a)(1) does not currently provide for such liability. (Mem. 21-22.) Yet, Haider concedes that the Supreme Court has strongly discouraged courts from using failed legislation as a guide for interpreting an existing statute (*id.* at 20), as "subsequent legislative history is a hazardous basis for inferring the intent of an earlier Congress . . . [and] is a particularly

---

[7] Haider's reliance on the interim rule regarding AML programs (*see* Mem. 20-21) is likewise misplaced, as that rule, by its own description, was not intended to speak to penalties or the scope of regulatory enforcement. *See* 67 Fed. Reg. 21, 114 (Apr. 29, 2002).

dangerous ground on which to rest an interpretation of a prior statute when it concerns, as it does here, a proposal that does not become law." *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650 (1990). Furthermore, this case is one in which the Court should be particularly wary of failed legislation because Congress has already made its intention clear with respect to individual liability and, as discussed above, adopting Haider's approach would create ambiguity and lead to "irreconcilably conflicting" results.

Moreover, near in time to when the legislation was proposed, a senior Treasury Department official submitted a prepared statement to the Senate Committee on Banking, Housing, and Urban Affairs, in which he described FinCEN as already having broad authority to seek penalties against individuals "who . . . participate" in AML violations, such that Congress was aware of the statute's implementation against individuals, and additional legislation on the topic would have therefore been unnecessary.[8] And the fact that a particular representative proposed legislation similar to what Congress already viewed as being permitted by Section 5321(a)(1) is unremarkable, as Congress frequently enacts legislation merely to codify existing law. *See, e.g.*, *Murphy v. New Milford Zoning Corp.*, 402 F.3d 342, 350 (2d Cir. 2005); *United States v. Delgado-Garcia*, 374 F.3d 1337, 1359 (D.C. Cir. 2004).

---

[8] The prepared statement read in relevant part: "[T]he BSA provides FinCEN with the broad authority to obtain injunctions against persons it believes have violated, are violating, or will violate the BSA. Likewise, the BSA allows FinCEN to impose civil penalties not only against domestic financial institutions and nonfinancial trades or businesses that willfully violate the BSA, but also against partners, directors, officers and employees of such entities who themselves actively participate in misconduct." S. Hrg. 113-10, at 1 (2013).

## II. THE ASSESSMENT SUPPORTS THE IMPOSITION OF A CIVIL MONEY PENALTY OF $1 MILLION AS TO BOTH THE AML AND SAR-FILING CLAIMS

Haider argues that, because the Assessment imposes a civil penalty for both failure to file SARs, as well as failure to maintain an effective AML program, the Assessment was required to expressly apportion the civil penalty between the violations.  (Mem. 22-23.)  Haider further argues that, in the absence of such apportionment, the entire penalty assessment should either be dismissed or remanded to the Treasury Department for further computation.  (*Id.*)  Haider's position lacks merit.

Section 5321(a)(1) provides that FinCEN may seek a civil penalty of at least $25,000 for each separate "transaction" as to which a SAR should have been filed.  31 U.S.C. § 5321(a)(1).  And the Assessment identifies far in excess of the 40 non-reported suspicious transactions that would be required to support a civil penalty of $1 million.  (*See* Hu Decl. Ex. A  at ¶¶ 97-101, 104-05, 107.)  Indeed, the allegations in paragraph 98 alone are sufficient to support a penalty on the SAR claim well in excess of $1 million.  (*See id.* ¶ 98 (alleging that an outlet that MoneyGram's Director of Fraud had identified as one of the "worst of the worst" and recommended for immediate termination in August 2007 — but that was not terminated during Haider's employment at MoneyGram — was reported as the receiving outlet for approximately 130 fraud-induced money transfers during the Tolling Period).)[9]  Haider's exposure on the AML claim also is itself well in

---

[9] Even taking the most conservative approach possible and assuming that only a single SAR should have been filed for each outlet for which MoneyGram customers had reported an excessive number of fraudulent transactions during the Tolling Period, the Assessment still supports a penalty on the SAR claim in excess of $1 million.  Section

excess of $1 million.  (*See* Compl. ¶ 67.)  Accordingly, the full amount of the civil

penalty was justified as to each claim, and thus remand for the purpose of recalculating

the penalty would be entirely without purpose.

Moreover, to the extent Haider is arguing that the Assessment should be vacated

on this ground, he has offered no legal authority to support such a result.  (*See* Mem. 23.)

All of the cases he cites stand for the proposition that the remedy for an improper penalty

calculation is not to vacate the assessment, but instead to remand back to the agency for

further calculation.  Because the penalty sought in this case is already well within the

range authorized by Section 5321(a)(1), remand to the agency is unnecessary.

Finally, if FinCEN proves at trial that Haider is liable on the SAR-filing claim, the

AML claim, or both, this Court will then undertake an inquiry to evaluate the amount of

the penalty assessed.  *See, e.g.*, *Moore v. United States*, No. 13-2063, 2015 WL 4508688,

at *1 (W.D. Wash. July 24, 2015); *United States v. Williams*, No. 09-437, 2014 WL

3746497, at *1-*2 (E.D. Va. June 26, 2014); *United States v. McBride*, 908 F. Supp. 2d

1186, 1214 (D. Utah Nov. 8, 2012).  Because either claim — as assessed — supports

---

5321(a)(1) authorizes a civil penalty of "the amount (not to exceed $100,000) involved in
the transaction (if any) or $25,000."  31 U.S.C. § 5321(a)(1).  Here, paragraphs 97
through 101 of the Assessment alone identify 14 outlets that were reported to
MoneyGram (by its customers) as the receiving outlets for an excessive number of fraud-
induced money transfers during the Tolling Period.  Assuming for each such outlet, that
all of the fraud-induced money transfers that it received during the tolling period
constituted only a single "transaction," and capping the losses associated with each
outlet's single "transaction" at $100,000, the available penalty for just those 14 outlets
was over $1 million.  (*See* Hu Decl. Ex. A at ¶¶ 97-101.)

liability well beyond the full amount of the Assessment, it would be premature to evaluate the propriety of that amount at this stage on an incomplete record.

## III. THE COMPLAINT'S CLAIM FOR INJUNCTIVE RELIEF IS TIMELY

Haider argues that the five-year statute of limitations imposed by 28 U.S.C. § 2462 ("Section 2462")[10] should apply to the Complaint's claim for injunctive relief because the BSA statute which provides for injunctive relief, 31 U.S.C. § 5320 ("Section 5320"), does not itself specify a limitations period.  (Mem. 23-28.)  Yet this argument ignores contrary precedent under which the Complaint's claim for injunctive relief is timely both because:  (1) in a Government enforcement action, a claim for injunctive relief is not subject to any statute of limitations; and (2) if a statute of limitations does apply, under the concurrent remedy doctrine, the six-year statute of limitations that applies to the Complaint's claim for a civil money penalty also applies to its claim for injunctive relief. (*See infra* Parts III.A-B.)

Furthermore, while Section 2462's five-year statute of limitations applies to penalties, it does not apply to relief, like the Injunction sought here, which seeks to protect the public.  (*See infra* Part III.C.)  And determining whether an injunction seeks to protect the public requires a fact-intensive inquiry that is inappropriate for resolution on a motion to dismiss.  (*See id.*)

---

[10] Section 2462 provides that "[e]xcept as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued . . . ."

## A. The Complaint's Claim for Injunctive Relief Is Not Subject to Any Statute of Limitations

A number of courts have held that because claims for injunctive relief brought by the Government in its enforcement capacity are equitable in nature, they are (1) *per se* exempt from Section 2462's limitations period (which, by its terms, does not apply to equitable relief), and thus (2) never time-barred. *See, e.g.*, *United States v. Banks*, 115 F.3d 916, 919 (11th Cir. 1997); *SEC v. Kelly*, 663 F. Supp. 2d 276, 286-87 (S.D.N.Y. 2009); *SEC v. Berry*, 580 F. Supp. 2d 911, 919 (N.D. Cal. 2008); *SEC v. Ogle*, No. 99 C 609, 2000 WL 45260, at *3-*4 (N.D. Ill. Jan. 11, 2000); *SEC v. McCaskey*, 56 F. Supp. 2d 323, 326 (S.D.N.Y. 1999). In adopting this above approach, the Eleventh Circuit in *Banks* relied on the well-established precedent that "an action on behalf of the United States in its governmental capacity . . . is subject to no time limitation, in the absence of congressional enactment clearly imposing it"; "any statute of limitations sought to be applied against the United States must receive a strict construction in favor of the Government"; and "absent a clear expression of Congress to the contrary[,] a statute of limitation . . . is enforced against the government only when the government is acting to vindicate private interests, not a sovereign or public interest." *Banks*, 115 F.3d at 919.

While the Eighth Circuit has not addressed this issue, this Court should adopt the above approach because an injunction is, by definition, an equitable form of relief, *see Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 211, n.1 (2002) ("injunction is inherently an equitable remedy"); "[t]he plain language of Section 2462 does not apply to equitable remedies," *Banks*, 115 F.3d at 919; and the approach is

27

strongly supported by the above-cited precedent. Moreover, adopting the above approach would serve an important policy consideration: it would avoid impeding FinCEN in its efforts to safeguard the public interest by pursuing injunctive relief against those who willfully violate the BSA. This same policy consideration led the court in *SEC v. Berry* to conclude that Section 2462 does not apply to claims for injunctive relief by the SEC, *see* 580 F. Supp. at 919 (observing that a statute of limitations "would frustrate the SEC's duty to . . . safeguard the public interest by enjoining securities violations"), and the Ninth Circuit in *SEC v. Rind* to find that no statute of limitations applies to civil enforcement actions brought by the SEC, *see* 991 F.2d 1486, 1490-92 (9th Cir. 1993). The reasoning of the Ninth Circuit in *Rind* applies equally here: like the SEC, FinCEN "must expend considerable time and energy investigating alleged violations of the [BSA]," violations of the BSA "may involve multiple parties and transactions of mind-boggling complexity," and therefore "[p]lacing strict time limits on [FinCEN's ability to seek injunctive relief] would quite plainly frustrate or interfere with [FinCEN's ability to carry out its important public function]." 991 F.2d at 1492.

Accordingly, this Court should adopt the above approach and reject Haider's argument for dismissal of FinCEN's claim for injunctive relief.

### B. Under the Concurrent Remedy Doctrine, the Same Statute of Limitations that Applies to the Government's Civil Money Penalty Claim Should Also Apply to Its Claim for Injunctive Relief

To the extent this Court concludes that a statute of limitations does apply to the Government's claim for injunctive relief, it should follow the concurrent remedy doctrine

and apply the six-year limitations period in Section 5321(b)(1) (which is also applicable to the Government's penalty claim) rather than the five-year period in Section 2462.

The concurrent remedy doctrine provides that the same statute of limitations that applies to a claim for legal relief (*e.g.*, a civil money penalty) should also apply to a claim for equitable relief (*e.g.*, an injunction), so long as both claims arise out of the same conduct. *See United States v. Mlaskoch*, No. 10-2669, 2014 WL 1281523, at *12 (D. Minn. Mar. 31, 2014). In *Sierra Club v. Otter Tail Power Co.*, the Eighth Circuit followed the concurrent remedy doctrine and applied Section 2462's statute of limitations to a claim for injunctive relief because the plaintiff was time-barred from pursuing the civil penalty claim it had brought under that same statute. 615 F.3d 1008, 1019 (8th Cir. 2010). Explaining its decision, the court noted that "where a legal and equitable remedy exist for the same cause of action, equity will generally follow the limitations statute." *Id.* at 1019.

As in *Otter Tail*, the Government here has filed claims for both legal and equitable relief that arise out of the same alleged conduct. The limitations periods for both claims should accordingly run in parallel. *Id.* Because the Government's claim for a civil money penalty is governed by the six-year statute of limitations in Section 5321(b)(1), this Court should apply that same period, rather than the five-year period in Section 2462, and find that the Government's claim for injunctive relief is timely.[11]

---

[11] Although *Otter Tail* involved the application of the concurrent remedy doctrine to bar an equitable claim where the related legal claim was time-barred, the reasoning of *Otter Tail* is not limited to that scenario and there is no reason why it should not also be applied to allow an equitable claim where the related legal claim is timely.

## C. Section 2462's Limitations Period Does Not Apply Because the Injunctive Relief Sought Here Is Not Penal in Nature

To support his argument that Section 2462 should apply to the Government's claim for injunctive relief, Haider relies on *Johnson v. SEC*, 87 F.3d 484 (D.C. Cir. 1996). (*See* Mem. 25-27 (citing *Johnson* and cases citing it)). However, *Johnson* is distinguishable from this case because: (1) it was decided after a two-day evidentiary hearing had occurred; and (2) even after the evidentiary hearing, the SEC had failed to demonstrate that an injunction was warranted based on the petitioner's "current competence or risk to the public." 87 F.3d at 490. Moreover, courts citing *Johnson* have held that "'the limitations period in § 2462 applies to . . . equitable relief that seeks to punish, but does not apply to equitable relief which seeks to remedy a past wrong *or protect the public from future harm*.'" *SEC v. Quinlan*, 373 F. App'x 581, 587 (6th Cir. 2010) (emphasis added) (quoting *SEC v. Jones*, 476 F. Supp. 2d 374, 381 (S.D.N.Y. 2007)). Such courts have further observed that resolving whether an injunction properly is subject to Section 2462 is a "fact-intensive inquiry," *see Quinlan*, 373 F. App'x at 587, thus rendering it inappropriate for resolution on a motion to dismiss.

Here, the Complaint expressly seeks injunctive relief to "prevent future harm to the public" (*see, e.g.*, Compl. ¶¶ 135, 143), and it alleges facts sufficient to support an inference that Haider poses a significant risk to the public such that Section 2462 should not apply. As summarized in the Background section above, the Complaint alleges egregious violations of the BSA on the part of Haider that were not isolated in nature, but rather continued over a lengthy period of time, and were the result of, at the very least,

extreme recklessness.  (*See generally* Compl. ¶¶ 68-126 (describing Haider's alleged BSA violations).)  These violations led to millions of dollars in losses to defrauded customers, and the Complaint's claim for injunctive relief seeks to prevent this harm from recurring.

At this stage of the litigation, the above recitation is sufficient to justify FinCEN's position that an injunction is necessary "to prevent future harm to the public."  (*See, e.g.*, *id.* ¶ 8.)  Moreover, it would be premature to reach the opposite conclusion (and hold that Section 2462 applies), as discovery — including Haider's own deposition testimony — will likely lead to additional evidence relevant to whether he poses a risk to the public such that an injunction is warranted.  For example, it would be relevant if Haider were to contradict prior statements he made accepting responsibility for MoneyGram's failure in early 2007 to terminate certain high-risk agents, including Money Spot.[12]  (*See id.* ¶¶ 50, 92.)

---

[12] Haider's assertion that he "has not worked at a financial institution" since 2008 (Def. Mem. 51) is an extraneous fact not properly considered on a motion to dismiss. Moreover, even if true, the assertion does not address whether Haider has "participat[ed], directly or indirectly, in the conduct of the affairs of a[] financial institution" since 2008, which is what FinCEN is seeking to enjoin.  (*E.g.*, Compl. ¶ 135.)  And one of the news articles that Haider has submitted with his motion to dismiss indicates that he has.  (*See* Lee Decl. Ex. 13 ("When [Haider] left MoneyGram, he spent several years as a compliance consultant . . . .").)  Moreover, it is not clear whether Haider has sought employment at a financial institution since 2008, or whether he intends to do so in the future.  All of these facts would be relevant to the Court's ultimate determination of this issue.

## IV.  FINCEN'S ACCESS TO AND USE OF GRAND JURY MATERIALS WAS AUTHORIZED AND PROPER

Prior to the Assessment, the Government requested that the United States District Court for the Middle District of Pennsylvania (the "MDPA") grant FinCEN access to grand jury material relating to the underlying investigation of MoneyGram (the "Grand Jury Information"), pursuant to 18 U.S.C. § 3322 ("Section 3322").  The MDPA did so, ultimately issuing three orders which authorized various individuals employed by or affiliated with FinCEN to access the Grand Jury Information (the "Disclosure Orders" or "Orders").  (Hu Decl. Exs. B-D.)[13]  In addition, the last of the three Disclosure Orders (the "Second Amended Disclosure Order") authorized FinCEN to use the Grand Jury Information in any eventual administrative or judicial proceeding.  (*Id.* at Ex. D.)

Notwithstanding the above-referenced Orders — which FinCEN provided to Haider's counsel on July 16, 2015 (along with the Government's applications for the Orders) — Haider continues to argue that (1) FinCEN was improperly allowed to access the Grand Jury Information because, Haider contends, it is not a "financial institution regulatory agency" within the meaning of Section 3322 (Mem. 28-32); and (2) FinCEN was not permitted to use the Grand Jury Information in connection with the Assessment or Complaint (*id.* at 32-34).  As an initial matter, because Haider essentially is seeking reconsideration of the MDPA's Disclosure Orders, he should be raising his arguments in the MDPA in the context of a motion to vacate the Orders, not in this Court in the context

---

[13] The Disclosure Orders, as well as the Government's applications for the Disclosure Orders, were unsealed on or about July 7, 2015, and July 13, 2015.  (Hu Decl., Exs. E-G.)

of a motion to dismiss. *See, e.g.*, *In re Sealed Case*, 250 F.3d 764, 771-72, 774 (D.C. Cir. 2001) (remanding the matter so the court where the grand jury was sitting could provide its rationale for why the need for disclosure outweighed the need for continued secrecy); *In re Grand Jury Proceedings*, 827 F.2d 868, 870 (2d Cir. 1987) (defendant in a civil suit in Florida in which the IRS was relying on grand jury material petitioned the New York court that had issued the relevant disclosure order to vacate the order). Haider's challenge to the Disclosure Orders is properly dismissed (without prejudice) for this reason alone.

Alternatively, because Haider's arguments are plainly without merit (*see infra* Parts IV.A-B), this Court may appropriately reject them (with prejudice). *Cf.* Fed. R. Crim. P. 6(e)(3)(G) ("If the petition to disclose arises out of a judicial proceeding in another district, the petitioned court must transfer the petition to the other court *unless the petitioned court can reasonably determine whether disclosure is proper.*" (emphasis added)).

## A. FinCEN is a "Financial Institution Regulatory Agency" Within the Meaning of Section 3322(b)

The plain language of Section 3322(b), as well as the language of the BSA, makes clear that FinCEN is a "financial institution regulatory agency" within the meaning of the statute.

### 1. The Plain Language of Section 3322(b) Makes Clear that FinCEN Is a "Financial Institution Regulatory Agency"

Section 3322(b) provides that a court may issue an order authorizing "disclosure of matters occurring before a grand jury during an investigation of a *banking law*

33

*violation* to identified personnel of a Federal or State *financial institution regulatory agency* . . . for use in relation to *any* matter within the jurisdiction of such regulatory agency." 31 U.S.C. § 3322(b)(1) (emphasis added). Although Section 3322 does not define the term "financial institution regulatory agency," it does define the term "banking law violation." *Id.* § 3322(d)(1) . The statute defines that latter term to include three categories of violations, the last of which is "a violation of . . . any provision of subchapter II of chapter 53 of title 31, United States Code." *Id.* "[S]ubchapter II of chapter 53 of title 31, United States Code," is the BSA. *See id.* § 5311 *et seq.*

Pursuant to 31 U.S.C. § 310 ("Section 310"), the Secretary of the Treasury has delegated to the Director of FinCEN the authority to administer the BSA. *See id.* § 310(b)(2)(I). The Secretary of the Treasury delegated such authority through Treasury Order 180-01. Treasury Order 180-01 (authorizing the Director of FinCEN to "take all necessary and appropriate actions to implement and administer the provisions of the Bank Secrecy Act").

Given that Section 3322 defines the term "banking law violation" to include three categories of violations, the last of which is a violation of the BSA, 31 U.S.C. § 3322(d)(1), and that FinCEN has been delegated the authority to administer the BSA, *id.* § 310(b)(2)(I); Treasury Order 180-01, it follows that the term "financial institution regulatory agency" encompasses FinCEN. Moreover, because FinCEN is the sole entity responsible for civil enforcement of numerous provisions of the BSA, including, as relevant here, those requiring money services businesses like MoneyGram to implement effective AML programs and file timely SARs, *see* 31 C.F.R. § 1010.810(d), interpreting

the term "financial institution regulatory agency" as excluding FinCEN would be illogical, as it would leave a significant hole in the statute's coverage. Accordingly, the term is read properly as including FinCEN. *See Bennett v. City of Holyoke*, 362 F.3d 1, 11 (1st Cir. 2004) (refusing "to interpret a statute in a way that would produce an entirely illogical result"); *Cook Inlet Native Ass'n v. Bowen*, 810 F.2d 1471, 1474 (9th Cir. 1987) (a "statute should not be interpreted . . . to defy common sense").

   2.   The Text of the BSA Also Makes Clear that FinCEN Is a "Financial Institution Regulatory Agency"

The conclusion that the term "financial institution regulatory agency" includes FinCEN is also supported by the language of the BSA itself. Under the BSA, the term "financial institution" is defined to include numerous entities over which FinCEN has civil regulatory jurisdiction, including money services businesses and casinos. *See* 31 U.S.C. § 5312(a)(2)(R), (X). And the BSA confers upon FinCEN — as a result of the above-referenced delegation of authority by the Secretary of the Treasury — the authority to take regulatory action in connection with such "financial institutions." *See, e.g.*, *id.* § 5318(a)(3) (FinCEN may "examine any books, papers, records, or other data of domestic financial institutions . . . relevant to the recordkeeping or reporting requirements of this subchapter"); *id.* § 5318(g)(1) (FinCEN may require that "any financial institution . . . report any suspicious transaction relevant to a possible violation of law or regulation"); *id.* § 5321(a)(1) (FinCEN may impose penalties on "[a] domestic financial institution"). FinCEN is thus clearly a "financial institution regulatory agency" within the meaning of Section 3322(b).

The other authorities Haider cites where the term "financial institution regulatory agency" is defined and FinCEN is not included in the definition are inapposite, because (unlike Section 3322) they do not address matters within FinCEN's regulatory jurisdiction. *See* 18 U.S.C. § 212(b), (c)(2) (defining the term in the context of a statutory provision addressing matters within the jurisdiction of agencies that "prescribe regulations . . . on the application for and receipt of credit . . . and on the application and receipt of residential mortgage loans"); 12 U.S.C. §§ 3301, 3302 (defining the term in the context of a statutory scheme creating a council to prescribe "uniform principles and standards for the . . . examination of financial institutions" by agencies other than FinCEN); H.R. Rep. No. 105-358, at 75, 80 (discussing the term in the context of addressing civil forfeiture, not the enforcement of matters within FinCEN's regulatory jurisdiction). In addition, Haider's citation to two documents that discuss FinCEN (which regulates banks and other financial institutions) separately from agencies that regulate banks (Mem. 31) is of no consequence; all of those agencies regulate "financial institutions."

## B. FinCEN Was Authorized Both to Access and to Use the Grand Jury Information

Haider asserts that the Disclosure Orders that FinCEN received from the MDPA pursuant to Section 3322(b) only permitted FinCEN to access the Grand Jury Information, but not to use it in connection with any administrative or judicial proceeding. (Mem. 32.) Haider claims that "there is nothing in Section 3322 that permits the public use of [grand jury] information for purposes of litigation without a return to the

grand jury judge and a request for an order under Rule 6(e)." (*Id.*) This argument is at odds with the plain language of Section 3322(b) (which allows for broad use of grand jury material), as well as the terms of the Second Amended Disclosure Order (which specifically authorized FinCEN to use the Grand Jury Information in any eventual administrative or judicial proceeding).

1. Section 3322(b) Contemplates Full Use of Grand Jury Material in an Administrative or Judicial Proceeding

Section 3322(b) provides that a court may issue an order, upon a finding of substantial need, authorizing the disclosure of grand jury material to agency personnel "for *use* in relation to any matter within the jurisdiction of such regulatory agency." 18 U.S.C. § 3322(b)(1)-(2) (emphasis added). Although Section 3322 does not define the term "use," a fundamental rule of statutory construction is that the plain meaning of the words is given the greatest weight in statutory interpretation. *See Browder v. United States*, 312 U.S. 335, 338 (1941). In the context of a regulatory agency like FinCEN (which has the authority to investigate matters, as well as to issue assessments and bring related civil actions), the plain meaning of the phrase "for use in relation to any matter within the jurisdiction of such regulatory agency" includes using the information in the body of any assessment and in the body of a judicial complaint seeking to recover an amount assessed. This comports with the standard definition of "use," which provides that information is used when it is "put into action or service." Merriam-Webster's Collegiate Dictionary 1297 (10th ed. 2001); *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014) (construing a term "in accordance with its

ordinary meaning," and relying on this same dictionary). Moreover, this reading of "use" is consistent with the use that is typically made of grand jury material; criminal AUSAs routinely use such material when investigating a case, but they also publicly disclose grand jury material in indictments and in the course of criminal trials. A more limited interpretation of "use" — that one "uses" information only to inform oneself of the facts of a case — is contrary to common sense and experience. Accordingly, upon obtaining a disclosure order under Section 3322(b), the statute authorizes a regulatory agency like FinCEN to use the grand jury material in a public assessment and in a judicial complaint (as well as evidence at trial).

To the extent Haider is arguing that even after FinCEN obtained the Second Amended Disclosure Order, it had to (1) obtain a separate order under Rule 6(e) and (2) make a showing of "particularized need" before using the Grand Jury Information (Mem. 32), he is wrong. Haider cites nothing to support this argument, and it is contrary to Rule 6(e). Rule 6(e) expressly provides that grand jury material may be disclosed to "a person authorized by 18 U.S.C. § 3322," *see* Fed. R. Crim. P. 6(e)(3)(A)(iii), and Section 3322(b)(2), in turn, provides for disclosure upon the showing of the less onerous standard of "substantial need."

> 2. The Second Amended Disclosure Order Expressly Authorized FinCEN to Use the Grand Jury Information in any Administrative or Judicial Proceeding

Not only does Section 3322(b) contemplate full use of grand jury material, but the Second Amended Disclosure Order expressly authorized FinCEN to use the Grand Jury Information at issue here in any eventual administrative or judicial proceeding, subject

38

only to the requirement that FinCEN comply with any protective order that might be entered in such proceeding.  (Hu Decl. Ex. D at 4.)

In connection with issuing the Second Amended Disclosure Order, the MDPA considered the requirements of Section 3322(b) and determined that they had all been satisfied.  (*Id.* at 1-2 (finding that FinCEN is a "Federal financial institution regulatory agency" and the "substantial need" requirement had been met).)  Moreover, after observing that further disclosures of the Grand Jury Information would be necessary "in order for FinCEN to take appropriate action under the civil injunctive and penalty provisions of 31 U.S.C. §§ 5320 and 5321," the MDPA expressly authorized FinCEN to make such further disclosures as may be necessary "in connection with any eventual administrative proceeding or civil litigation."  (*Id.* at 2, 4.)  This authorization was subject only to the caveat that any such further disclosures would be "subject to any protective order that may be entered by a court with jurisdiction over such proceeding."  (*Id.*)

Accordingly, FinCEN's use of the Grand Jury Information in its Assessment and the Complaint was authorized.  Contrary to Haider's assertions, there was no need for FinCEN to return to the MDPA to obtain any further orders before using the Grand Jury Information in its Assessment or the Complaint.  (*Cf.* Mem. 32.)  Nor is there a need now for either party to return to the MDPA to obtain any further orders to allow for additional use of the Grand Jury Information in this litigation (*e.g.*, in discovery).  (*Cf. id.* at 34.)  The language of the Second Amended Disclosure Order authorizes such use.  (Hu Decl. Ex. D at 4.)

To the extent Haider is arguing that the MDPA lacked the authority to issue the Second Amended Disclosure Order because Section 3322(b) does not provide for the issuance of orders authorizing the use of grand jury material in public proceedings (*see* Mem. 32-33), he is incorrect.  Such an argument finds no support in the text of the statute, which, as set forth above, provides for the issuance of orders broadly authorizing "use in relation to any matter within the jurisdiction of [the receiving] agency."  18 U.S.C. § 3322(b)(1)(A).  Nor is this argument supported by the legislative history Haider cites[14] or any other authority of which the Government is aware.[15]

Accordingly, this Court should dismiss Haider's challenge relating to FinCEN's access to and use of the Grand Jury Information.

## V.   HAIDER'S DUE PROCESS RIGHTS WERE NOT VIOLATED

As an initial matter, although Haider asserts that his due process arguments are properly raised on this motion to dismiss, he has cited no authority for that position

---

[14] The legislative history supports the Government's position; it shows that Congress contemplated that banking agencies would use grand jury material disclosed pursuant to Section 3322 to, *inter alia*, "take actions to prevent an institution's failure," which could include initiating public proceedings in which such material might be referenced.  H.R. Rep. 101-54(I), at 474.

[15] The Department of Justice's Asset Forfeiture Policy Manual (the "Manual") does not support Haider's argument.  In the context of discussing Section 3322(a), which authorizes the disclosure of grand jury material to civil AUSAs in certain circumstances without the need to obtain a court order, the Manual addresses whether a civil AUSA receiving such material can then, in the absence of a court order authorizing further use of the material, reference the material in a publicly-filed complaint.  The Manual concludes that such use is proper and covered by the statute.  While correct, FinCEN is not relying on that interpretation here, because it obtained a court order authorizing the use it has made, and will make, of the Grand Jury Information.  Contrary to Haider's suggestion, there is nothing in the Manual that suggests the "particularized need" standard has any relevance to an order issued under Section 3322.  (*Cf.* Mem. 33 n.16.)

beyond a single, inapposite case from the Court of International Trade.[16]  (*See* Mem. 35.)

Moreover, Haider has not explained why the information on which he relies which is

neither fairly encompassed within the complaint nor subject to judicial notice is properly

before this Court.  *See Miller*, 688 F.3d at 931 n.3  (in deciding a motion to dismiss, the

district court "generally must ignore materials outside the pleadings").  Although a court

"may consider some materials that are part of the public record or do not contradict the

complaint, as well as materials that are necessarily embraced by the pleadings," *id.* at

931, much of the information on which Haider relies does not meet this criteria.  (*See,*

*e.g.*, Mem. 5-7, 43-45 (containing Haider's slanted and incomplete description of the

process he received before FinCEN issued the Assessment).)  Accordingly, because

Haider's due process challenge is based on factual assertions that are not properly

considered on a motion to dismiss, the Court should deny it.

    In any event, even if the Court were to consider Haider's due process challenge —

and accept his factual assertions as true — the challenge nevertheless fails on the merits.

Haider's due process challenge is based primarily on *Matthews v. Eldridge*, 424 U.S. 319

(1976), under which competing interests are balanced to determine the process required

---

[16] Haider's reliance on that case, *United States v. Maxi Switch, Inc.*, 18 F. Supp. 2d 1040 (Ct. Int'l Trade 1998), is misplaced for a variety of reasons, including because:  (1) to resolve the defendant's due process challenge, the court did not resolve disputed facts against the Government or adjudicate the issue on an incomplete factual record (which, as discussed below, Haider is asking this Court to do); (2) the court ultimately rejected the defendant's due process challenge and therefore did not consider whether it would have been appropriate to grant a motion to dismiss in a case like this on due process grounds; and (3) the court noted that "an opportunity for trial de novo" — which Haider will have here — "affords defendants all due process to which they are entitled," *id.* at 1046.

prior to a deprivation of a property or liberty interest.  However, Haider ignores a predicate point:  before a court engages in a *Matthews* balancing exercise, the movant must establish that he was deprived of a protected interest in property or liberty as a result of the challenged government action.  *See, e.g.*, *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999); *Gordon v. Hansen*, 168 F.3d 1109, 1114 (8th Cir. 1999).  Here, neither of the challenged actions — FinCEN's issuance of the Assessment or application for the Injunction — deprived Haider of a protected property interest (as he claims) because until a court reduces the Assessment to judgment or so orders the requested Injunction, Haider has not been deprived of anything.  Haider's due process challenge fails for this reason alone.  (*See infra* Part V.A.)  Moreover, Haider is entitled to discovery and a trial *de novo* in this Court, which is also fatal to his due process challenge, because, through this action, he will receive all of the process to which he is entitled.  (*See infra* Part V.B.)

In any event, evening ignoring the above arguments, Haider's due process challenge fails because, even accepting the facts as Haider has presented them, the process he received prior to the Assessment was more than sufficient.  (*See infra* Part V.C.)  To be clear, FinCEN disputes Haider's characterization of the pre-Assessment process he received, as, among other things, it omits significant aspects of that process.  But even if this Court were to accept Haider's characterizations and resolve his due process challenge on this incomplete record, Haider's own submissions establish that he

received adequate process.[17]  (*See id.*)  Finally, even assuming that a then current FinCEN employee was the source of the media leaks to which Haider has pointed (another extraneous fact), that would not be a basis for dismissal of this suit; nor was he denied any due process rights on account of those leaks.  (*See infra* Part V.D.)  Thus, if this Court were inclined to consider Haider's due process challenge on the merits, it should reject it.

### A.  Haider Was Not Entitled to Any Process Prior to this Lawsuit Because, to Date, He Has Not Been Deprived of a Cognizable Interest

Haider claims that the issuance of the Assessment and the request for the Injunction "implicate[] [his] property rights."  (Mem. 36)  Yet neither of those challenged actions deprived Haider of a cognizable property interest.  Accordingly, he was not entitled to any particular process prior to this lawsuit.

With respect to the Assessment, this lawsuit will provide Haider with adequate process (*see infra* Part V.B.), and no actual deprivation will occur prior to the resolution of this lawsuit.  Indeed, Haider has not alleged that, to date, the Assessment has adversely affected any of his cognizable property rights.  Nor could he.  FinCEN has not taken any action to collect the Assessment, and it will not do so prior to obtaining a judgment in this case.  Moreover, FinCEN is not seeking interest or any other sum from Haider other than the amount of the Assessment.  (*See* Compl. at 56-57.)  Therefore, while the Assessment

---

[17] To the extent the Court has any questions about the process Haider received, the Government respectfully submits that the Court should defer its consideration of this issue to summary judgment or trial, at which point it will have a full record before it.  *See Timmy S. v. Stumbo*, 537 F. Supp. 39, 44 (E.D. Ky. 1981) ("[T]he Court also expresses no view on the issue of what process is due.  Such a determination would necessarily entail factual investigation, an endeavor particularly inappropriate on a motion to dismiss.").

has the *potential* to "*implicate*[] Mr. Haider's property rights" (Mem. 36 (emphasis added)) — *i.e.*, if and when FinCEN obtains a judgment in this case — it has not actually deprived him of any such rights. *See Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 217-18 (1994) (no due process concern where "penalty assessments become final and payable only after full review by . . . the appropriate court of appeals"); *see also United States v. Capital Tax Corp.*, No. 04-4138, 2007 WL 488084, at *3 (N.D. Ill. Feb. 8, 2007) (finding that the statutory scheme pursuant to which the EPA imposes cleanup obligations does not implicate due process rights because, to compel compliance with such obligations and collect any penalty for noncompliance, the EPA must file suit in district court and "that lawsuit . . . provides the potentially responsible party with due process of law, and that due process occurs before any deprivation").

Similarly, Haider has not been deprived of a cognizable property right through FinCEN's mere application for the Injunction. (*Cf.* Mem. 36-37.) While FinCEN is seeking an Injunction against Haider, it has not enjoined him from doing anything. As with the above-referenced Assessment, no deprivation (*i.e.*, no injunction) will occur prior to a ruling in FinCEN's favor in this lawsuit.

The cases Haider cites are inapposite. Unlike here, they all involved circumstances where a cognizable right had been taken away or an obligation to take immediate action (with consequences for noncompliance) had been imposed at the agency level. *See, e.g.*, *FDIC. v. Mallen*, 486 U.S. 230, 232-35, 238, 240 (1988) (petitioner was deemed to have been deprived of a property interest where the FDIC invoked its authority under a different statutory scheme to immediately suspend the

petitioner from his position as president of a particular bank); *Business Commc'ns, Inc. v. U.S. Dep't of Educ.*, 739 F.3d 374, 379, 382 (8th Cir. 2013) (petitioner was deemed to have been deprived of a property interest where "it was forced" — by an agency order — "to reinstate [a previously-terminated employee] and pay him back pay," and where the agency could file suit and seek "statutory sanctions" beyond what the order required for non-compliance, including "exemplary damages and attorneys' fees," which is not the case here); *Chernin v. Lyng*, 874 F.2d 501, 502-04 (8th Cir. 1989) (petitioner was deemed to have been deprived of a property interest where the USDA required that he be fired before the USDA would allow his employer to engage in the meatpacking business).

### B. Haider Is Entitled to Discovery and a Trial *De Novo* in this Action, Thus Nullifying His Due Process Arguments

Haider's ability to obtain discovery and a trial *de novo* in this Court is also fatal to his due process arguments. Haider predicts that the Government "will contend that the appropriate standard of review in this proceeding is "'abuse of discretion.'"  (Mem. 37.)  But that is not the Government's position, nor is it suggested by the cases he cites. Rather, in this case, the parties should be permitted to engage in discovery under the Federal Rules of Civil Procedure, and this Court should then determine *de novo* — and FinCEN should be required to prove by a preponderance of the evidence — Haider's liability.  This position is consistent with both the legislative history of the BSA and the position the Government and courts have taken in prior actions by the Government to recover penalties assessed under the statute at issue here, Section 5321.  (*See infra* Part V.B.1.)  Thus, even if Haider has been deprived of a cognizable property right (and he

has not), his ability to obtain discovery and a trial *de novo* nullifies his claim that he has been denied due process.  (*See infra* Part V.B.2.)

1.  Haider Is Entitled to Discovery and a Trial *De Novo* in this Action

The BSA authorizes FinCEN to "assess a civil penalty" for a violation of Section 5321(a)(1), and then to "commence a civil action to recover [the] civil penalty assessed." 31 U.S.C. § 5321(b)(1)-(2).  The legislative history of the BSA and prior judicial decisions interpreting the BSA support the Government's position that, in connection with that "civil action," (1) the parties should be permitted to engage in discovery, and (2) FinCEN should be required to prove the defendant's (here, Haider's) liability at trial by a preponderance of the evidence.

In an action to recover a civil penalty assessed pursuant to Section 5321(a)(1), the legislative history of the BSA makes clear that Congress intended that the Government would be required to prove liability by a preponderance of the evidence.  In initially enacting Section 5321(a)(1) in 1970, Congress stated:

> The civil penalty provisions in sections 125 and 207 of the bill [section 207 was the predecessor to Section 5321(a)(1)], as well as the forfeiture provision in section 232[,] would all be governed by chapter 163 (sections 2461 through 2465) of Title 28, United States Code. *These provisions established a five-year statute of limitations, put the burden of proof on the government, and require proof by a preponderance of the evidence.*  The burden is less strict than the "beyond a reasonable doubt" test applied in criminal actions.

H.R. Rep. No. 91-975 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4394, 4404 (emphasis added).  Congress thus intended that (1) the Government would have five years from the

46

relevant triggering event to assess a civil penalty,[18] and in the context of a civil action to recover the assessed penalty, (2) the Government would have to offer evidence in a trial *de novo* sufficient to carry its burden of proof.

In addition to being supported by the BSA's legislative history, the Government's position that Haider is entitled to discovery and a trial *de novo* is consistent with both (1) the position the Government has taken in prior actions to enforce civil penalties assessed under Section 5321, and (2) the standard of review that courts have previously applied to such actions. *See Moore v. United States*, No. 13-2063, 2015 WL 1510007, at *4, *5 (W.D. Wash. Apr. 1, 2015) (after allowing the parties to conduct written and deposition discovery, the court adopted the Government's position that it "should determine *de novo* whether [the defendant] is subject to [a] . . . penalty" for failing to file a Report of Foreign Bank and Financial Account ("FBAR") under Section 5321); *McBride*, 908 F. Supp. 2d at 1214 (the court conducted a bench trial to determine whether the Government had proven by a preponderance of the evidence that the defendant was liable for an FBAR penalty; after trial, the court rendered a decision without affording any deference to the Government); *United States v. Williams*, No. 1:09-cv-437, 2010 WL 3473311, at *1 (E.D.N.Y. Sept. 1, 2010) (after discovery, the court conducted a bench trial to determine whether the Government had proven "by a preponderance of the evidence on

_____

[18] This limitations period was later extended to six years. *See* 31 U.S.C. § 5321(b)(1).

the record established at trial" that the defendant was liable for an FBAR penalty), *rev'd on other grounds by Williams*, 489 F. App'x. 655.[19]

The rationale of the *Williams* court is instructive. In concluding that the defendant was entitled to a trial *de novo* to determine his liability for the assessed penalty, the court noted that its conclusion was consistent with the approach taken in enforcement actions brought by the Government in other contexts. *See Williams*, 2010 WL 3473311, at *1. Additionally, the court observed that "a *de novo* standard is appropriate given that [Section] 5321 provides for no adjudicatory hearing before a[] . . . penalty is assessed." *Id.* Notably, the Fourth Circuit reversed the district court's decision in *Williams* on the ground that it disagreed with the district court's finding that the defendant had not acted "willfully" within the meaning of Section 5321, but, in doing so, the Fourth Circuit did not suggest any concern with the district court's approach of conducting a trial *de novo* to determine liability.[20] *See Williams*, 489 F. App'x at 658-60.

---

[19] *See also United States v. Hom*, 45 F. Supp. 3d 1175, 1178-81 (N.D. Cal. 2014) (after allowing discovery as to the Government's claim that the defendant was liable for an FBAR penalty, the court granted the government's motion for summary judgment; the court afforded no deference to the Government on the issue of liability).

[20] FinCEN's position that Haider is entitled to a trial *de novo* to determine liability is also consistent with Supreme Court precedent. The Supreme Court has held that: (1) an action like this one — brought by the United States to recover a civil penalty — is akin to a common-law action to recover a debt; and (2) in such an action, the Government is required to prove liability at trial. *See Tull v. United States*, 481 U.S. 412, 418-20, 427 (1987); *see also id.* at 428 (agreeing that "the proper analogue to a civil-fine action is the common-law action for debt, [in which] the Government need . . . prove liability by a preponderance of the evidence") (Scalia, J. concurring in part and dissenting in part).

2. Haider's Ability to Obtain  Discovery and a Trial *De Novo* Nullifies His
Claim that He Has Been Denied Due Process

"A trial *de novo*, in which the existence of a violation is examined afresh, and the parties are not limited in their arguments to the contents of the administrative record, satisfies the strictures of procedural due process."  *Kim v. United States*, 121 F.3d 1269, 1274 (9th Cir. 1997) (citing case); *see also*, *TRM, Inc. v. United States*, 52 F.3d 941, 944 & n.13 (11th Cir. 1995) (denying a due process challenge because "the provision of a *de novo* hearing in the district court adequately protects an aggrieved [party's] procedural due process rights").  In fact, the case on which Haider relies to support raising a due process challenge in this motion to dismiss — *Maxi Switch*, 18 F. Supp. 2d at 1040 (*see* Mem. 35) — notes that "an opportunity for trial *de novo* affords defendants all due process to which they are entitled . . . ."  *Id.* at 1046 (citing *Nickey v. Mississippi*, 292 U.S. 393, 396 (1934)).  Accordingly, Haider's ability to obtain discovery and a trial *de novo* in this Court is fatal to his due process challenge.[21]

**C.  Even If Haider Was Entitled to Due Process Prior to this Lawsuit, the Process He Received Was More than Sufficient**

Because Haider has not been deprived of any cognizable property right and will receive discovery and a trial *de novo* in this action, this Court may properly reject

---

[21] Courts have previously taken the position that in a BSA case such as this one, the defendant's liability is determined *de novo*, but the Government's decision regarding the amount of the penalty to impose is reviewed for abuse of discretion.  *See, e.g.*, *Moore*, 2015 WL 1510007, at *4 n.3 (citing cases).  Haider asserts that this bifurcated approach, if applied here, would result in a violation of his due process rights.  (Mem. 38.)  Yet, even if this Court were to adopt this approach (which it need not decide now), that would pose no due process issue.  *See Moore*, 2015 WL 4508688, at *1 (adopting this approach after rejecting a prior due process challenge).

Haider's due process challenge without addressing the adequacy of the process he received at the administrative level.  Moreover, as set forth above, any adjudication of that latter issue is appropriately deferred to summary judgment or trial.  However, even if the Court were to address the issue — and accept Haider's slanted and incomplete recitation of the relevant facts — it should nonetheless find that the pre-Assessment process he received was constitutionally sufficient.  (*See infra* Part V.C.1-2.)

　　　　1.　Applicable Legal Standards

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."  *Mathews*, 424 U.S. at 333; *see Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 817 (8th Cir. 2011).  Such opportunity to be heard can take place through a combination of pre- and post-deprivation procedures.  *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 547-48 (1985); *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971); *Moore*, 2015 WL 1510007, at *11.

Although due process ordinarily requires some form of pre-deprivation "hearing," it does not require an adversarial hearing, a full evidentiary hearing, or even a formal hearing; an "informal consultation" may suffice.  *See Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1 (1978) ("The opportunity for informal consultation with designated personnel empowered to correct a mistaken determination constitutes a 'due process hearing' in appropriate circumstances."); *see also id.* (due process requires only "that he who is entitled to it shall have the right to support his allegations by argument however brief, and, if need be, by proof, however informal"); *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 266 (1987) ("as a general rule the [petitioner's] interest is adequately protected

without the right of confrontation and cross-examination, again so long as the [petitioner] is otherwise provided an opportunity to respond at a meaningful time and in a meaningful manner"); *Flath v. Garrison Pub. Sch. Dist. No. 51*, 82 F.3d 244, 247 (8th Cir. 1996) ("informal meetings with supervisors [prior to termination] are sufficient to satisfy the due process hearing requirement"). At bottom, the due process requirement "is flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334; *see Moore*, 2015 WL 1510007, at *11 (in analogous context, finding that "[t]he opportunity that the IRS gave [the defendant] to present his arguments in writing and by telephone [was] adequate").

Three factors generally are relevant to the due process analysis: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail." *Mathews*, 424 U.S. at 335.

### 2. The Process that Haider Received Was More than Adequate

Even considering only Haider's slanted and incomplete account, the process that he received prior to the Assessment was sufficient; it ensured that he received not only notice of the challenged actions and an opportunity to contest them, but also far more than what due process requires, including (1) an overview of FinCEN's "*prima facie* case" against him, (2) access to a core set of documents on which FinCEN was relying,

and (3) numerous opportunities to meet with and present his arguments to FinCEN personnel.[22] (*See* Mem. 5-6, 43-44.) Indeed, as reflected in Haider's own submissions, FinCEN afforded him the following process:[23]

- FinCEN sent a letter to Haider, dated October 16, 2013, notifying him that it was considering whether to assess a civil money penalty and/or take additional enforcement action against him for violating the BSA in connection with his employment at MoneyGram. The letter informed Haider that he could submit to FinCEN any information that he believed relevant to its evaluation of whether a civil money penalty and/or additional enforcement action were warranted. (Decl. of Matthew D. Lee ("Lee Decl.") Ex. 1.)

- Haider retained sophisticated counsel, and on November 15, 2013, "Haider's counsel met with FinCEN officials . . . and discussed FinCEN's proposed enforcement action against Mr. Haider." (Mem. 6; Lee Decl. ¶ 1-2, 5.) Haider's counsel also had "substantive meetings and calls" with FinCEN officials on "subsequent" occasions. (Mem. 6, 51.) During the parties' discussions, FinCEN "provided Mr. Haider with . . . its *prima facie* case" against him. (*Id.* at 44.) In other words, FinCEN disclosed to Haider, through his counsel, the factual allegations and legal theories on which it planned to rely. FinCEN also identified the amount of the penalty it was considering imposing. (*Id.* at 7; Lee Decl. Exs. 5, 12.)

- In addition, FinCEN informed Haider's counsel that its claims against Haider were "based upon records collected by the grand jury in the [MDPA]," and "[i]n February and March 2014, Mr. Haider's counsel was permitted to review approximately 500 pages of materials which, according to FinCEN, constituted the government's *prima facie* case against him." (Mem. 7; Lee Decl. ¶¶ 6-7.) These materials included the grand jury "testimony" of relevant witnesses.

---

[22] FinCEN notes that, although the Court need not consider additional facts to resolve Haider's due process challenge in FinCEN's favor, Haider received additional process which he has not acknowledged in his submissions to the Court. To the extent this Court is inclined to reach the issue of the adequacy of the process Haider received at this stage and believes it requires additional information to resolve the issue in FinCEN's favor, FinCEN requests an opportunity to supplement the record.

[23] The Government cites to Haider's extraneous factual allegations solely to show that Haider's own submissions establish that the process he received was sufficient.

(Mem. 45.)  FinCEN subsequently produced to Haider's counsel an additional set of documents on which it planned to rely.  (Mem. 7; Lee Decl. ¶ 7.)

- Accordingly, prior to issuing the Assessment, FinCEN disclosed the key aspects of its case to Haider, and provided Haider, through his counsel, with numerous opportunities to respond to FinCEN's claims.  Haider was additionally provided the opportunity to submit, as part of his response, any information that he believed was relevant to his defense.  (Lee Decl. Ex. 1; Mem. 5-6, 43-44.)  Substantive meetings and discussions between FinCEN and Haider's counsel continued through at least October 2014.  (*See* Lee Decl. Ex. 13.)

The above procedures exceeded the dual requirements of due process; they provided Haider with "the opportunity to be heard at a meaningful time and in a meaningful manner."  *Mathews*, 424 U.S. at 333.  Moreover, the above procedures (which, again, are an incomplete recitation of the process that Haider received) are more robust — and provided more notice and opportunity to be heard — than the procedures deemed sufficient in the *Moore* case.  In that case, the court denied a due process challenge where, prior to filing a district court action to recover a penalty assessed under the BSA, the IRS did only the following:  (1) conducted a five minute interview with the defendant; (2) sent the defendant a letter stating that it was proposing assessing a penalty of $40,000, but "provid[ing] almost no information about the basis for that penalty"; (3) allowed the defendant to request an "appeal" of the proposed assessment, which the court made clear "d[id] not resemble a traditional appeal" and "was akin to an order to show cause why [the IRS] should not impose [the] penalt[y]"; and, after the defendant's counsel presented his arguments against imposition of the penalty, (4) issued a notice of assessment.  2015 WL 1510007, at *2-*3, *11.  Even under Haider's version of the facts, FinCEN gave Haider far more meaningful process than this.

The procedures that FinCEN followed in this case (even as described by Haider) also plainly pass muster under the *Mathews* balancing test. Here, the first *Mathews* factor, "the private interest . . . affected by the official action" is, at most, slight. As set forth above, Haider has not been made to pay any money and has not been enjoined from doing anything, and will not be unless this Court orders otherwise. Accordingly, to the extent there has been any deprivation to date (and the Government does not believe that there has), it is negligible. The second factor, "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," is also minimal. Prior to issuing the Assessment, FinCEN provided Haider, through his counsel, with its *prima facie* case and access to hundreds of pages of documents on which it was relying. Over the course of several months of meetings and discussions, FinCEN also offered Haider numerous opportunities to tell his side of the story. Moreover, though this lawsuit, Haider will have the opportunity to pursue discovery and this Court will then adjudicate his liability *de novo*. The final factor, "the Government's interest," is significant, as Haider's proposed approach (full document discovery and an evidentiary hearing at the administrative level (*see* Mem. 40, 45-47)) would be costly, time-consuming and unnecessary given the process Haider received and his opportunity for discovery and a trial *de novo* in this Court. Thus, even accepting Haider's account of the process he received, there was no due process violation under the *Mathews* balancing test.

Haider's arguments as to why the process he received was insufficient are unavailing. *First*, Haider asserts that "FinCEN has no regulations governing procedures

to be followed by the agency prior to the assessment of a civil money penalty" and does not provide "for a hearing before a neutral hearing officer." (Mem. 39-40.) Yet the existence of "regulations governing procedures" is beside the point. What matters is whether the actual procedures FinCEN followed satisfied the requirements of due process. As set forth above, even accepting Haider's description of those procedures, they did. *See Moore*, 2015 WL 1510007, at *8, *11 (finding no due process violation in analogous circumstance notwithstanding that "no codified procedures bind the IRS when it assesses FBAR penalties"). Moreover, due process does not require a hearing before a neutral officer pre-deprivation, so long as a neutral party ultimately adjudicates the matter post-deprivation. Here, Haider will receive a neutral adjudication in this Court, which is sufficient.[24] *See Locurto v. Safir*, 264 F.3d 154, 174-75 (2d Cir. 2001) (due process does not require neutral adjudicator in pre-deprivation administrative hearing where claimant has ability to pursue impartial post-deprivation judicial review); *see also Farhat v. Jopke*, 370 F.3d 580, 595-96 (6th Cir. 2004) ("[I]n the pretermination stage, the employee does

---

[24] Haider's description of the process the IRS follows in assessing unpaid taxes (and interest and/or penalties for unpaid taxes) is immaterial. (Mem. 40-42.) Those procedures are different than the abbreviated procedures that the IRS follows in assessing penalties under the BSA, which, as discussed above, (1) are less robust than the procedures FinCEN followed here and (2) were approved by the court in *Moore*. Moreover, what matters here is not what the IRS does in assessing taxes, but whether the procedures that FinCEN followed provided Haider with a sufficient opportunity to be heard, which they did. Finally, Haider's assertion that the *Moore* court "relied upon" the "IRS Appeals function . . . in rejecting [the defendant's] due process challenge" (Mem. 42) is misleading. As set forth above, the *Moore* court downplayed the significance of that aspect of the process. The significance of the appeal function to the *Moore* court was that it provided an opportunity for the defendant to present his arguments as to why a penalty should not be assessed. *See* 2015 WL 1510007, at *11. Haider was provided with many such opportunities.

not have a right to, and the Constitution does not require, a neutral and impartial decisionmaker. . . . It is at the post-deprivation stage where a neutral decisionmaker is needed to adjudicate the evidence.").

*Second*, Haider asserts that he "was severely limited in responding [to FinCEN's claims] because FinCEN provided [him] with only its *prima facie* case, forcing [him] to guess with respect to what he should try to refute." (Mem. 44.) This argument fails on its face. By disclosing its *prima facie* case to Haider (including documents on which it was relying), FinCEN identified for Haider precisely what it was claiming. There was no mystery here; Haider knew precisely what to address.

*Third*, Haider argues that his due process rights were violated because, prior to issuing the Assessment, FinCEN did not disclose to Haider all of the documents in its possession relating to MoneyGram. (Mem. 43-45.) But there was no requirement that FinCEN produce any documents to Haider prior to the Assessment, much less all of the documents Haider has identified. Indeed, "[d]ue process does not mandate that all evidence on a charge or even the documentary evidence be provided, only that such descriptive explanation be afforded as to permit [the claimant] to identify the conduct giving rise to the [proposed government action] and thereby to enable him to make a response." *Linton v. Frederick Cnty. Bd. of County Comm'rs*, 964 F.2d 1436, 1440 (4th Cir. 1992); *see Moore v. King Cnty. Fire Protection Dist. No. 26*, 327 F. App'x 5, 6 (9th

Cir. 2009). In providing Haider access to the documents comprising its "*prima facie* case," FinCEN went beyond what is required for due process.[25]

The cases on which Haider relies to support his contrary position (*see* Mem. 42-46) are off point. While some support the proposition that an individual subject to a deprivation must eventually be afforded an opportunity to review all adverse evidence and confront available witnesses (a proposition with which FinCEN does not disagree), they do not require — and indeed it is not required — that that opportunity occur pre-deprivation. *See, e.g.*, *Business Commc'ns, Inc.*, 739 F.3d at 381.

*Finally*, Haider argues that he was denied due process because (1) the Assessment was signed by FinCEN Director Jennifer Shasky Calvery ("Director Calvery"), and (2) she was previously the head of AFMLS and involved in the prior grand jury investigation of MoneyGram. (Mem. 50.) As a threshold matter, Haider's assertion of bias is untimely. Haider was represented by the same sophisticated counsel in the prior administrative proceedings as he is now, he knew full well who would be issuing the Assessment, and though the alleged facts that he relies upon now were equally available to him during the administrative process, he never previously raised this concern. *See Marcus v. Dir., Office Workers' Comp. Programs, U.S. Dept. of Labor*, 548 F.2d 1044, 1050-51 (D.C. Cir. 1976) (rejecting claim of bias as untimely; "[i]t will not do for a

---

[25] For this same reason, there is no due process problem with the procedure FinCEN set up whereby Haider was required to execute a confidentiality agreement prior to FinCEN providing him with the above-referenced documents. Contrary to Haider's assertion, the confidentiality agreement did not "preclude[] [him] from offering any meaningful rebuttal" to FinCEN (Mem. 34); rather, it merely limited his ability to disclose the material to third parties.

claimant to suppress his misgivings while waiting anxiously to see whether the decision goes in his favor"). Moreover, Haider bases his bias argument on factual assertions that are outside the scope of the Complaint. (*See* Mem. 50.)

In any event, Haider's bias argument fails on the merits for at least two reasons. *First*, as discussed above, the Assessment did not deprive Haider of any property rights (*see supra* Part V.A.), and therefore none of his due process rights — including his right to an adjudication by a non-biased tribunal (which he will receive in this Court) — have been implicated, let alone violated. *See Gordon*, 168 F.3d at 1114 (before reaching the question of whether the plaintiff was deprived of "a fair and impartial tribunal," the "plaintiff, first, must establish that his protected liberty or property interest is at stake").

*Second*, Haider's bias argument is based on a false premise — that Director Calvery improperly performed both "adjudicative" and "prosecutorial" functions with respect to him. (Mem. 48-49.) As an initial matter, when Director Calvery signed the Assessment, she did not adjudicate Haider's rights. Rather, such adjudication will occur in this Court in the context of this action. (*See supra* Part V.A.) This distinguishes this case from the cases Haider cites, where the allegedly biased officials performed a judicial or quasi-judicial role and resolved disputed facts and/or made binding determinations in a way that directly affected a cognizable property or liberty interest of the complaining parties. (*See* Mem. 48-49.)

Moreover, even assuming that Director Calvery functioned as an adjudicator, her prior functions with respect to Haider (as alleged by Haider) do not overcome the presumption of impartiality that attaches to agency decision-makers. When examining a

claim of bias, courts "begin with a presumption that decision-makers are honest and impartial," *Marler v. Missouri State Bd. of Optometry*, 102 F.3d 1453, 1457 (8th Cir. 1996) (citing *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)), and a claimant bears the burden of producing sufficient evidence to overcome this presumption, *see Williams v. Dep't of Labor,* 879 F.2d 327, 331 (8th Cir. 1989). The mere fact that an agency decision-maker previously performed an investigative or prosecutorial function related to a party does not itself constitute a due process violation. *See Withrow*, 421 U.S. at 58; *see also William Jefferson & Co. v. Bd. of Assessment & Appeals*, 695 F.3d 960, 965 (9th Cir. 2012) (noting only the "potential[]" for greater concern of bias where there is overlap between adjudicative and prosecutorial functions). Instead, to state a viable claim of bias, the claimant must also show "special facts and circumstances . . . that [create a] risk of unfairness [that] is intolerably high." *Withrow*, 421 U.S. at 58.

Here, Haider's allegations — that Director Calvery "supervised the grand jury investigation of MoneyGram," and was involved in decisions to give Haider and others immunity during that investigation (Mem. 50) — are insufficient to establish the requisite "intolerably high" risk of bias on the part of Director Calvery vis-à-vis Haider (*e.g.*, that she had predetermined the outcome of this separate action against him or harbored some other animus). Haider's allegations are also readily distinguishable from the facts of the cases he cites where bias was found.[26]

---

[26] *See, e.g.*, *Walker v. City of Berkeley*, 951 F.2d 182, 184-85 (9th Cir. 1991) (decision-maker in petitioner's administrative proceeding on a particular issue had previously moved to dismiss a federal court action brought by the same petitioner concerning the same issue); *Am. Gen. Ins. Co. v. FTC*, 589 F.2d 462, 463 (9th Cir. 1979)

Moreover, the Eighth Circuit's decision in *Gordon v. Hansen*, 168 F.3d at 1112, 1114, is on point and strongly supports the conclusion that Director Calvery's alleged prior functions with respect to Haider pose no due process concern. In *Gordon*, the Nebraska Department of Banking (the "Department") and the FDIC decided to commence an investigation into a particular bank (the "Bank"), based on allegations of misconduct involving the Bank's general counsel. *Id.* at 1111. During the investigation, the Department issued an "emergency order" to the Bank requiring that it "cease and desist from allowing [the general counsel] to act as an executive officer of the Bank." *Id.* at 1112. The general counsel thereafter requested and was granted a hearing on the emergency order. *Id.* In connection with that hearing, the Director of the Department (the "Director") served as the deciding official, and ultimately sustained the emergency order. *Id.* The general counsel later sued the Director, claiming that the Director had violated his due process rights by "act[ing] as a quasi-judicial officer in [connection with the hearing on the emergency order] while also initiating the investigation and directing

_____

(decision-maker in petitioner's administrative proceeding on a particular issue had previously opposed the same petitioner on the same issue in a federal court case); *Utica Packing Co. v. Block*, 781 F.2d 71, 74, 78 (6th Cir. 1986) (after an administrative officer had ruled against the agency on a particular issue, the Secretary of the agency removed the administrative officer from his position, replaced him with the subordinate of an interested agency official, and then filed a motion for reconsideration of the initial administrative officer's decision with the subordinate); *Am. Cyanamid Co. v. FTC*, 363 F.2d 757, 765-68 (6th Cir. 1966) (decision-maker in petitioners' administrative proceeding on a particular issue had previously led and had extensive involvement in a congressional inquiry into the same issue, had formed opinions on those issues, and had prepared a letter on behalf of Congress to the agency for which he later served as decision-maker urging that the agency find against petitioners).

the Department officials in the investigation and prosecution of [the general counsel] and the Bank." *Id.* at 1113 & nn.8, 10. The Eighth Circuit rejected this claim, stating:

> [W]e cannot say that the alleged combination of [the Director's] investigating and judging functions constitutes a denial of procedural due process. In this situation, the involved procedure did not create an unconstitutional risk of bias in the administrative adjudication, and [the general counsel] has not overcome the presumption of honesty and integrity of his adjudicator.

*Id.* at 1114.

Here, Director Calvery's alleged position vis-à-vis Haider (who ultimately was a witness in the MoneyGram investigation) is even less suggestive of potential bias than the Director in *Gordon*'s position vis-à-vis the general counsel (who was the focus of the investigation). The Eighth Circuit's finding of no due process violation in *Gordon* compels a finding of no due process violation here.

### D. Haider Was Not Denied Due Process Based on Leaks of the Investigation to the Media

Haider's final due process argument — that this case should be dismissed because a then current FinCEN employee allegedly leaked information about FinCEN's investigation to the news media, which prompted Haider's private employer to fire him (Mem. 52-53) — is without merit. Like a number of Haider's other arguments, this argument is based on facts that are neither part of the Complaint nor properly considered on a motion to dismiss. Moreover, at most, the alleged leaks would be relevant only to whether Haider suffered a cognizable deprivation under the stigma-plus doctrine for purposes of a tort claim; under no circumstances would they affect the validity of the Assessment or constitute a basis for dismissal of this case. In any event, Haider cannot

meet the requirements of the stigma-plus doctrine, and therefore cannot establish that he suffered a cognizable deprivation on account of the leaks.

To establish a deprivation under the stigma-plus doctrine, the party asserting the deprivation must show that: (1) the other party made a statement sufficiently derogatory to injure his or her reputation, which he or she claims is false (the "stigma requirement"); and (2) the allegedly false statement had an adverse effect on some interest more tangible than reputational harm (the "plus requirement"). *See, e.g.*, *Mead v. Indep. Ass'n*, 684 F.3d 226, 233 (1st Cir. 2012); *Shands v. City of Kennett*, 993 F.2d 1337, 1347 (8th Cir. 1993); *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004). Moreover, a number of courts have held, there must be direct government action in connection with both the "stigma" and the "plus"; the "plus" cannot be "an injury caused by the act of some third party in reaction to the Government's defamatory statements." *Am. Consumer Publishing Ass'n, Inc. v. Margosian*, 349 F.3d 1122, 1126 (9th Cir. 2003); *see also Mead*, 684 F.3d at 233-34 ("the 'plus' . . . cannot be the loss of [the petitioner's] job with a private employer"); *Izzo v. City of Syracuse*, No. 98-0778, 2000 WL 1222014, at *7 (N.D.N.Y. Aug. 3, 2000) ("State action must accompany both prongs of the 'stigma-plus' test."), *aff'd by summary order*, 11 Fed. Appx. 31 (2d Cir. 2001); *Elkins v. Gallagher*, No. 96-464, 1997 WL 441274, at *4 (M.D. Fla. May 30, 1997) (same). This requirement makes sense because "[i]f [a litigant] only has to show that the state defamed him — and not that the state did something else as well — in order to state a claim for [a cognizable] deprivation . . . , the effect would be to transmute all defamation actions against state actors in which plaintiff can show some harm resulting from the defamation into [a

constitutional tort claim]." *Sullivan v. State of New Jersey*, 602 F. Supp. 1216, 1222-23 (D.N.J. 1985), *aff'd*, 853 F.2d 921 (3d Cir. 1988); *see WMX Techs., Inc. v. Miller*, 80 F.3d 1315, 1320 (9th Cir. 1996); *but see Marrero v. City of Hialeah*, 625 F.2d 499, 516 n.23 (5th Cir. 1980).

Haider has not met, and cannot meet, either the stigma or the plus requirement.  As an initial matter (and assuming that a then current FinCEN employee was responsible for each of the alleged leaks), Haider has not identified any alleged leaks that he claims contain false statements, and any stigma-plus claim thus fails for this reason alone.  *See Vega v. Lantz*, 596 F.3d 77, 82 (2d Cir. 2010) (rejecting stigma-plus claim on this ground).

Moreover, the statements in the leaks — that FinCEN was investigating Haider and had concluded that he is properly subject to a multi-million dollar civil penalty for the role he played in MoneyGram's compliance lapses (*see* Lee Decl. Exs. 5-6, 8, 10, 12-13) — do not rise to the level of a cognizable "stigma."  "The requisite stigma has generally been found in cases in which the employer has accused the employee of dishonesty, immorality, criminality, racism, or the like."  *Shands*, 993 F.2d at 1347.  Of the statements at issue here, the ones most critical of Haider suggested that he faces significant civil exposure for failing to take sufficient action when presented with evidence that MoneyGram agents were defrauding MoneyGram customers.  (*See, e.g.*, Lee Decl. Ex. 6.)  Such statements are not akin to accusations of "dishonesty, immorality, criminality, racism, or the like."  *Id.*

Finally, Haider cannot show the "plus" required to establish an actionable deprivation under the stigma-plus doctrine. The only purported "plus" Haider has identified is the asserted loss of his employment following the leaks, and the ensuing difficulty he claims to have experienced finding other employment. However, the decisions to terminate or to not hire Haider were made by private employers, thus eliminating the acts as a valid "plus." *See, e.g.*, *Mead*, 684 F.3d at 233-34; *Am. Consumer Publishing Ass'n, Inc.*, 349 F.3d at 1126.

## CONCLUSION

For the foregoing reasons the Court should deny Haider's motion to dismiss.